Boorse, Appellant, *v.* Springfield Township.

Argued November 23, 1953. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Thomas Z. Minehart,* with him *Alexander Knight* and *Samuel Polsky,* for appellant.

*John E. Landis,* with him *David E. Groshens* and *Elmer L. Menges,* for appellees.

Opinion by Mr. Chief Justice Horace Stern, March 22, 1954:

Plaintiff's case cannot surmount the barrier of the rule establishing the immunity of municipalities from liability for torts committed by their employes in the course of performance of a governmental function unless a right of recovery is expressly granted by statute.

Shortly after midnight a valuable racing mare was discovered in a helpless condition with one leg wedged in a culvert draining into a gutter at the edge of a public highway in Montgomery County. Whether it was partly on the shoulder of the highway or entirely on private property does not appear. Two police officers, one employed by Springfield Township and the other by Upper Dublin Township, both of which townships border on this highway, arrived on the scene and shot and killed the mare. Plaintiff, the owner of the mare, brought action against the townships to recover the value of the animal. In his complaint he alleged that the officers knew that the mare was his property but they did not notify him or give him any opportunity to extricate the animal, nor did they make any effort to determine whether the condition of the mare made it necessary to destroy her.

Both townships filed preliminary objections to the complaint, one of which set up the doctrine of non-liability of the townships for the act of the policemen. The court sustained this objection and plaintiff appeals.

More than a century ago it was held in *Fox v. The Northern Liberties*, 3 W. & S. 103, that the defendant in that case, an incorporated district, was not liable for a trespass committed by its Superintendent of Police, who was alleged to have illegally seized a horse under a false pretense that its owner was violating the ordinance of the district. The court said (p. 106):

". . . nor is it conceivable how any blame can be fastened upon a municipal corporation, because its officer, who is appointed or elected for the purpose of causing to be observed and carried into effect the ordinances duly passed by the corporation for its police, either mistakenly or wilfully, under colour of his office, commits a trespass; for in such case, it cannot be said, that the officer acts under any authority given to him, either directly or indirectly by the corporation; but must be regarded as having done the trespass of his own will, and he alone must be looked to for compensation, by the party injured."

In *Elliott v. The City of Philadelphia*, 75 Pa. 347, which also happened to involve the seizure of a horse by the police, the same principle of immunity of the municipality was applied. There a carriage was being driven on a street of the city faster than was permitted by an ordinance; a policeman took the driver and the horse into custody and then negligently allowed the carriage to be broken and the horse to escape, run away and be killed. Citing the *Fox* case as authority, the court sustained a demurrer to the plaintiff's declaration and gave judgment for the defendant.

Since these early cases there has followed a veritable multitude of others which, under varying facts, sustained the same doctrine.[1] As stated in *Hartness*

---

[1] For example: *Knight v. City of Philadelphia*, 15 W.N.C. 307; *Kies v. City of Erie*, 135 Pa. 144, 19 A. 942; *Betham v. Philadelphia*, 196 Pa. 302, 312, 46 A. 448, 451; *Scibilia v. Philadelphia*, 279 Pa. 549, 124 A. 273; *Steele v. McKeesport*, 298 Pa. 116, 148 A. 53; *Devers v. Scranton City*, 308 Pa. 13, 161 A. 540; *Hartness v. Allegheny County*, 349 Pa. 248, 37 A. 2d 18; *Kunz v. Titusville*, 373 Pa. 528, 97 A. 2d 42; *Cousins v. County of Butler*, 73 Pa. Superior Ct. 86; *Koscelek v. Lucas*, 157 Pa. Superior Ct. 548, 43 A. 2d 550. For the general application of the doctrine by practically all other jurisdictions see 38 Am. Jur. 317, §620 and, more particularly in regard

*v. Allegheny County,* 349 Pa. 248, 249, 250, 37 A. 2d 18, 19, "It [the law] distinguishes between the acts of municipalities done in their proprietary or business capacity and those which they perform as functions of government delegated by the State. As to the former the doctrine of respondeat superior applies; as to the latter, it does not." Of course, police officers perform essentially a governmental function. It is true that municipalities are not clothed with immunity in certain cases, such as those involving highway construction, the building of public works, or the maintenance of a nuisance; these are well established exceptions to the rule and as such are explained in *Scibilia v. Philadelphia,* 279 Pa. 549, 555, 556, 124 A. 273, 275, 276.

It is clear that if the policemen in the present case were not acting within the scope of their authority their employers, the two townships, would not be liable for their acts;[2] if, on the other hand, they were engaged in the exercise of the police power of the municipalities in removing a traffic hazard or obstruction on the highway, in that event also the townships would not be liable for their acts. Therefore, in either view of the situation, plaintiff's case cannot succeed.

The decision in *Radobersky v. Imperial Volunteer Fire Department,* 368 Pa. 235, 81 A. 2d 865, upon which plaintiff principally relies, has no bearing upon the

---

to wrongful acts of municipal employes in connection with the impounding or destruction of animals, 2 Am. Jur. 803, §152.

[2] It seems that the point where the horse was trapped was on the Springfield Township side of the highway; therefore, as far as the Upper Dublin Township policeman was concerned, he was acting beyond his jurisdictional authority, which extended only within the geographical limits of his own township, and on that ground also the Upper Dublin Township would clearly be exempt from liability.

situation here involved. There plaintiff's automobile was struck at an intersection by a truck of the defendant fire company, the operator of the truck having negligently caused the collision by traveling at an undue speed and through a red light. Defendant claimed that it was immune from liability for the accident on the ground that it was both a charity and an agency performing a governmental function. The court held, however, that such immunity did not attend it because it was returning at the time from participation in a firemen's parade. Obviously, the employes of the defendant while it was engaged in parading were neither performing, nor purporting to perform, any governmental function or any duty connected with the service of the fire department and therefore the ordinary rule of liability of an employer for the negligent act of an employe was properly applied.

Judgment affirmed.

––––––

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In the darkness of early morning on October 3, 1953, a valuable thoroughbred racing horse named "All's Over," strayed from an enclosure on the land of its proprietor, and, doubtlessly excited over an unexpected freedom, headed for distant highways. At a point close to the boundary line between Springfield Township and Upper Dublin Township, "All's Over" unwaringly entered into a culvert and there became wedged at a spot about 200 yards south of Dresherton Road. Shortly after this involuntary halting of movement, two policemen arrived—one from Springfield Township and the other from Upper Dublin. Without making any effort to dislodge the imprisoned but uninjured animal, and without seeking counsel of its well-

known owner, the two policemen fired ten revolver shots into the horse.

For "All's Over," it was now indeed all over.

After their brave deed had been accomplished, the police officers notified the owner, Herbert C. Boorse, who made arrangements to have the horse transported to the University of Pennsylvania Veterinary Hospital where an autopsy was performed. With an unintentional caprice that only added to the tragedy of the occurrence, the examining doctor reported that there was absolutely nothing wrong with the horse except ten bullet holes in its head.

Boorse brought an action of trespass against Springfield and Upper Dublin Townships, asking for $25,000 damages for the loss of his private property. The defendants filed preliminary objections on the ground that townships, being governmental subdivisions, were immune from tort actions for the acts of their policemen. The lower court sustained the objections and entered judgment for the defendants. The plaintiff appealed to this Court which has affirmed the action of the lower court.

A citizen of the United States has been deprived of a valued possession worth $25,000 under circumstances of undoubted wanton negligence, and yet he may not even be heard in Court. The first principle a student encounters as he prepares to fit himself for the practise of the law is that there is no right without a remedy, or, stated in another manner, there is no wrong that may not be corrected in law. But this case presents a wrong which no one can deny, and yet the plaintiff pleads in vain for a hearing.

The defendant municipality Springfield Township resists liability on the ground that it is not responsible for any act of "misfeasance or non-feasance" of its policemen. The Complaint, however, describes an act

of malfeasance, specifically charging the two police-
men with conduct which was "both wilful and wanton,"
exhibiting a "reckless disregard of the property rights
of the plaintiff."

In the year 1876, the mayor of Philadelphia was
sued for ordering the destruction of property which the
mayor claimed was a nuisance and a fire hazard. The
jury returned a verdict for the defendant, and the
property-owner appealed. Although this Court af-
firmed the verdict, it specifically declared, through
Chief Justice SHARSWOOD, "that the case was properly
submitted to the determination of the jury." (*Fields
v. Stokley*, 99 Pa. 306) It could well be that even in
this case the jury would return a verdict for the de-
fendants, but the plaintiff has the right to have a jury
pass upon the issue he presents. In justifying the ac-
tion of the Philadelphia mayor, Chief Justice SHARS-
WOOD said: "It is stated as a fact in the special plea,
and of course a fact admitted by the agreement, that
the public safety was imperilled . . . If the owner or
tenant of a powder magazine should madly or wickedly
insist upon smoking a cigar on the premises, can any-
one doubt that a policeman or even a neighbor could
justify in trespass for forcibly ejecting him and his
cigar from his own premises? . . . *The official position
of the defendant, as mayor of Philadelphia, did not re-
lieve him from his personal responsibility in this re-
spect.* But he has been sustained by the verdict of the
jury, which is a justification of his alleged trespass."*

But no jury has here justified the action of the po-
lice officers employed by the two defendant townships.

As the mayor in the *Fields v. Stokley* case pleaded
a fire hazard, so also the defendant municipalities here
pleaded a traffic hazard. But it is not clear how the

_____

* All italics, mine.

police removed an alleged traffic hazard by substituting for an erect live horse an inert and enormous carcass spread flatly over a thoroughfare. Nor is it apparent how the defendants justify the use of firearms for the removal of a "traffic hazard". We presume that one effective way to prevent traffic congestion would be to set up machine guns at busy intersections, but such a procedure would scarcely be acceptable to the law.

Springfield Township, in its preliminary objections, argues in effect that the presence of All's Over constituted an abatable nuisance, but it was never established that the horse was on a public highway. The Complaint, the averments of which must be accepted as true, declared that the plaintiff's horse was lodged in a culvert "off the paved section of the highway."

Did the policemen here use care commensurate with the danger the defendant municipalities conjure up in their preliminary objections? In the case of *Herron v. Pittsburg*, 204 Pa. 509, 513, decided in 1903, the plaintiff was injured by coming into contact with an electrically charged broken police call wire. He sued the City and recovered a verdict. This Court, in affirming the verdict, said: "It is the duty of all parties using a highly dangerous agent, to use care commensurate with the danger, in order to prevent injury to persons or property exposed to its influence . . . *Cities are not excepted from the rule, and the fact that the agent is used or supervised under the police power does not excuse negligence in such use.*" When the wire broke, a duty of examination devolved upon the City. "Whether that duty was properly met", this Court said through Mr. Justice MITCHELL, "under all the circumstances, the lapse of time, the condition and population of the neighborhood, the urgency of the possible danger, etc., *was a question for the jury.*"

Applying the reasoning of the *Herron* decision to the case at bar, the plaintiff was entitled to a jury trial which would determine whether the duty of the defendant townships, as to proper instruction, training and surveillance of the police officers, was met.

In *Radobersky v. Imperial Volunteer Fire Department*, 368 Pa. 235, a fire company was held responsible for injuries inflicted on a motorist, through the negligent operation of a fire truck while returning from a parade in a town some distance from its home territory. This Court declared that when not fighting fires, the fire company was "subject to the same liability with respect to its fire truck as applies to other motor vehicles while being operated upon a public highway."

Thus, if even fire companies are not immune from liability when engaged in an operation disconnected from their primary function of extinguishing fires, certainly a municipality should not be excused from responsibility in damages when it maintains police who use firearms for operations extraneous to the purpose for which the firearms were issued.

In *Brink v. Borough of Dunmore*, 174 Pa. 395, the defendant borough was held liable for the action of its officers who (without the intervention of Board of Board of Viewers proceedings) entered the plaintiff's property, tore down fences, removed trees and otherwise injured the property in order to construct a sidewalk. At the trial the defendant borough requested the Court to charge as follows: "The defendant, the borough of Dunmore, is not liable in damages for the trespass alleged in this case until it is shown that the borough, by express authority from the corporate officers, by ordinance or resolution duly and legally enacted, authorized or directed the persons who committed the trespass to do what was done on the premises of the plaintiff . . . The borough of Dunmore is

not liable for the trespass of its officers not in the line of their duties as laid down by law or municipal enactment, unless expressly authorized by legal action of the corporate authorities to do the special thing complained of." The trial judge refused both points. This Court, upon appeal here, sustained the refusal of these points and affirmed the judgment entered for the plaintiff.

Employing the reasoning invoked in the *Dunmore* case, why should the defendant townships here be allowed to escape responsibility for the trespasses of their officers? Why shouldn't there have been a factual adjudication as to whether the policemen had or had not been instructed, either directly or by implication, that they were not to destroy private property where no criminal or civil damage was being threatened?

The defendants' denial of liability is based on the argument that townships, being subdivisions of government, are immune from liability arising out of alleged governmental functions. If a traveller returning from a Soviet-dominated country were to relate to an American audience having seen two Communist policemen draw guns and slay a horse, and then recite further that the owner of the slaughtered beast was denied compensation for the loss of his property, the listeners would undoubtedly voice emphatic indignation and disgust over such a manifestation of unbridled tyranny. Why is a similar act in America enveloped in impeccable legality?

It is the theory of the Majority Opinion, affirming the lower court which sustained preliminary objections to the plaintiff's Complaint, that a citizen suffering a loss of the character here described is without remedy because the principle of immunity for sovereign power is so imbedded in law that we are power-

less to change it. In support of this position, the majority cites the case of *Fox v. The Northern Liberties,* 3 W. & S. 103, where a superintendent of police, (in 1841) under the guise of enforcing an ordinance, appropriated the plaintiff's horse and sold it. Upon appeal to this Court it was held that the owner of the horse was without remedy because the municipal corporation could not be held responsible for the act of its agent.

The Majority Opinion also cited *Elliott v. The City of Philadelphia,* 75 Pa. 347 (decided in 1874), another horse case. There, police officers of the City of Philadelphia seized the plaintiff's horse because of an asserted violation of a speed limit and then so negligently cared for it that the horse broke away and was killed. The plaintiff sued the City, the City demurred on the grounds of non-suability, the lower court granted judgment on the demurrer, and this Court, on appeal, affirmed the judgment.

For decades now the ghosts of these precedents have been clattering down the highways of the law, and it is about time that some Court stopped them and led them to pasture. Their usefulness on the thoroughfare of logic and true justice is over. It is not consonant with twentieth century American justice to say that property may be destroyed by anyone, much less the State (the very symbol of correctness in organized society), with legal impunity. The law of nature, compounded of the dictates of the Supreme Lawmaker and reason emanating from untrammeled intellect, rebels against this antiquated doctrine of irresponsibility, no matter by whom or by what exercised.

The theory of governmental immunity for the tortious acts of governmental representatives, employes and agents is founded upon the presumption that a sovereign power cannot be adjudged in error, and this

idea in turn stems from the meretricious formula that a king can do no wrong. The history of kings has been the history of usurpation of power through wars, conquest, assassination, oppression and treachery. Once having climbed to the throne and seized the scepter of absolute jurisdiction the kings announced that their authority derived from God and that, being divinely appointed and anointed, they of course could do no wrong. Through the operation of this bold and mendacious theorum, the kings immunized themselves from prosecution for past treason, present offenses and contemplated future crimes. Since the king created the courts and selected the judges, the proposition that the monarch was infallible acquired the sanction of law.

However, despite the supposed protection of God, kings were poisoned, waylaid, beheaded and otherwise murdered. Their successors then denounced the acts of the dead sovereigns and they themselves set up a new series of "divinely" inspired acts of robbery and murder. Mankind can stand so much, whereupon the people of a given kingdom rebel, and the divine right of kings is shown to be what it always was, the emptiest pretension and the sheerest nonsense. But even with dethronement and beheadings, there has still lingered around the figure of a king an intangible awe springing from the memory of his absolutism which opened and locked prison gates and which carried sword points in his words. No one approaches even a dead lion with indifference. Thus, despite the fact that America discarded kings nearly two centuries ago and that the English monarch is now but an innocuous geniality, the common law deriving from British sovereigns still proclaims that the sovereign power can do no wrong.

The time has come to bury this legal charlatanry in the grave of its discredited monarchial grandsires. From time to time courageous judges have thrown

spadefuls of earth in this direction, but there has not been a concerted collective effort to entomb this fiction which is recognized by a goodly portion of the judiciary as sheer fantasy. Our own Court has on many occasions repudiated in individual cases the doctrine of governmental immunity but it has also paid obeisance to this discredited theory, merely because there are cases in the books which support it. I myself refuse to admit that a palpable error in law must be persisted in simply because it is an old error.

The *Fox* case, supra, was decided in 1841. Many horses have entered the eternal grazing ground of the Last Roundup since that decision. The outer world presents methods of transportation entirely undreamed of by the judges of 1841. Many locomotives of judicial adjudication have demolished the precedent in the *Fox* case. Nonetheless, it continues to lift its equine head from time to time in presumed authority to decide facts and circumstances in a society of 1954 as far removed and as changed from 1841 as television is removed from the magic lantern.

Shadows from the rationalization in the *Fox* case fell across the pattern of reasoning in the case of *Hartness v. Allegheny County*, 349 Pa. 248, decided in 1944. On March 2, 1938, Leon Hartness, resident of Pittsburgh, entered, on a business errand, the Allegheny County Courthouse which houses the criminal and county courts of Allegheny County and provides offices for county commissioners, sheriff, clerk of courts, county treasurer and other officials. As he emerged from this citadel of government, a quantity of ice and snow detached itself from the roof and fell on his head. With the falling of this missile, Hartness was struck with the realization that the government was something less than careful as to his safety, comfort and security. He brought suit against Allegheny County for negli-

gence in the maintenance of the roof, but he was non-suited; and this Court affirmed the nonsuit on the basis that although some of the operations in the courthouse could be considered of a proprietary character, the building was primarily dedicated to governmental functions and, therefore, there could be no recovery against the County, a governmental subdivision.

So far as legal precedent is concerned, this exposition is understandable and acceptable, but in the republic of logic and fundamental justice, the decision strides with an imperialistic step. The fact that Hartness was injured through no fault of his own on the very steps of the palace of the law should, in outright fairness, speak a greater reason, rather than a lesser one, for appropriate redress.

It was not questioned that with a pitch of 60% in a distance of 70 feet, accepted modern precautions would have dictated the construction of a parapet or snowguard on the courthouse roof to imprison wintry accumulations against a precipitate fall upon pedestrians beneath. It is clear that had this icy avalanche slipped from the crest of the Frick Building across the street from the courthouse and fallen on Leon Hartness's head, his lawsuit against the proprietors of the Frick Building would have been received in the courts and, with the establishment of negligence on the part of the proprietors, a plaintiff's verdict would have been sustained. It is not enough to say, in reply to the natural query which follows as to why there should be this discrimination between defendants, that a suit against the Frick Building is a suit against a corporation and a suit against Allegheny County is a suit against the government. In moral justice this is no answer because logically one would have to conclude that Hartness should have a greater reason to recover from Allegheny County, to which he pays taxes for

protection, than from the owners of the Frick Building who are mere strangers to him.

But it is said that Allegheny County is part of the government, and you cannot sue the government. And I query: Why?

As a matter of fact, it is not even true that you cannot sue the government. We know that the government, in one form or another, is sued every day. Allegheny County is the defendant in scores of lawsuits each year. And so is the City of Pittsburgh. And, for that matter, so also is the Commonwealth of Pennsylvania.

The fact that the Commonwealth in civil cases can and does initiate suits as a plaintiff is evidence that it can appear also as a defendant because if it had absolute power it would not need to pass through the medium of the Courts to assert its absolutism. Certainly the Soviet Union never sues to take property. Of course, if the Constitution of Pennsylvania declared that neither the State, nor its subdivisions, was subject to lawsuit, that would end the matter because the Constitution, being the will of the people, can declare anything. But the Constitution has not so stated. If anything, the Constitution would seem to invite the people to a redress of grievances against tortfeasors regardless of identity. In fact, it would be strange indeed if, although one can sue a corporation, bank, railroad, his neighbor, even his brother, sister, father or mother, he could not sue the government. In a government founded on the proposition that all men are created equal, it would be an anomaly that one can obtain redress from everyone but the entity supposed and intended to be answerable to all its citizens.

In a government of checks and balances, with no branch or department supreme over any of the others, it would be extraordinary that the whole of these inter-

dependent parts should become irresponsible to the only power that is sovereign, the people.

In 1919 Helen Bell of Pittsburgh entered an elevator in the City-County Building, which is adjacent to the courthouse, moving southwardly on Grant Street. Because of negligence in the maintenance and operation of the elevator, Helen Bell was severely injured. She sued and obtained a verdict against Allegheny County. Her verdict was affirmed by this Court. In view of the fact that the City-County Building houses not only courts but many county and city functions of a corporate character, this Court declared that "the courts cannot be expected to unscramble the mixed relations in which the parties [the City and the County] find themselves through their agreement." Here was a suit against the government and the plaintiff recovered because the Court could not unscramble the governmental and proprietary functions of the two governmental subdivisions in the building, although in the *Hartness* case the Court *did* unscramble the ice and snow of governmental and proprietary functions, for it was also alleged there that the County carried on business operations in the Courthouse.

In *Fox v. Philadelphia,* 208 Pa. 127, this Court again sustained a verdict against a governmental subdivision (City of Philadelphia) for the negligent operation of an elevator which killed the plaintiff's decedent who was *in attendance upon one of the multitudinous courts* in the City Hall in Philadelphia.

In *Briegel v. City of Philadelphia,* 135 Pa. 451, the City of Philadelphia was sued for allowing water from a defectively constructed privy well on its property to seep through to the adjoining premises. The plaintiff recovered a verdict and this Court affirmed the verdict, saying: "The ownership of property entails certain burdens, one of which is the obligation of care

that it shall not injure others in their property or persons, by unlawful use or neglect. This obligation rests, without regard to personal disabilities, on all owners alike . . . by virtue of their ownership, *and municipal corporations are not exempt.*"

In 1853 the City of Pittsburgh was held responsible because of negligent acts of its agents which caused the destruction of the plaintiff's steamboat at the City's wharf. (*Pittsburgh City v. Grier*, 22 Pa. 54).

There are many decisions and statutes which here and there break down the supposed impregnable wall which hedges sovereignty. In 1879 Allegheny County was held liable for the value of 60 barrels of whiskey destroyed by a mob, the liability arising out of the failure of Allegheny County to provide sufficient police protection to safeguard life and property. (*County of Allegheny v. Gibson's Son & Co.*, 90 Pa. 397.) Of course, the liability in that case was strictly a statutory one (Act of March 20, 1849, P. L. 184), but it was argued before this Court that the Act had outlived its usefulness (particularly because of the interposition of the Constitution of 1874). In rejecting that contention this Court said, speaking through Mr. Justice PAXSON: "No reason has been shown why the act in question is not now as essential to the order and good government of the cities affected by it as it was at the time of its passage. Regarding it as a remedial statute, the very riots which are the subject of the present contention furnish a potent argument to show that it has not outlived its usefulness. Its application to the Philadelphia riots of 1844, showed that at that time it was a much needed police regulation. It enabled the owners of property destroyed to recover its value; at the same time it inculcated a lesson of inestimable value to the municipal authorities and taxpayers of that city, the good results of which are seen in a well trained police

force, and a freedom from mob violence that is exceptional. The increased growth of the cities of Philadelphia and Pittsburgh, not only in area and population, but also in the materials and elements out of which spring riots and disorders, tends to show that the Act of 1841 is even more essential now than at any prior period."

There is no constitutional prohibition against governmental responsibility for the acts of its agents in failing to offer adequate and proper police protection, or in failing to safeguard the public against injury due to negligence. Municipalities are regularly sued because of defective streets, improper construction of roads and buildings, faulty maintenance of parks, etc., etc.

There are, on the other hand, innumerable decisions to the effect that the government cannot be sued. These two lines of cases have created indescribable confusion in the law. We have seen that Allegheny County was not liable when snow and ice engulfed Leon Hartness because the wintry cascade departed from a roof which covered the criminal and county courts, the county commissioners' offices and so on, but we have noted also that Allegheny County was held liable when Helen Bell was injured in an elevator in a building which houses all the Common Pleas Courts of Allegheny County, all the Orphans' Courts of Allegheny County, and the Superior and Supreme Courts of Pennsylvania as well!

There have not been lacking instances where, from the same set of facts, two decisions have emerged. In 1890 Maria Bertha Kies, living in Erie, Pennsylvania, fell before the doors of a fire engine house which suddenly and violently opened across the pavement on which she was walking. She brought an action in trespass against the City of Erie, basing her action on

the negligent action of the fireman who operated the door. She was nonsuited and this Court affirmed the nonsuit on the basis that the City was not answerable for the negligence of an employe in its fire department. (135 Pa. 144). She then sued the City alleging that the natural and probable operation of the doors was dangerous, even though accompanied by the use of ordinary care. She recovered a verdict and this Court allowed the verdict to stand—but it was *the City of Erie,* a subdivision of the sovereign Commonwealth, which was sued *in each instance.* (*Kies v. Erie,* 169 Pa. 598)

In *Scibilia v. Philadelphia,* 279 Pa. 549, this Court said: "The implied common law liability or nonliability of municipality for the torts of its servants depends upon the character of service they were performing at the time of the injury. If they were acting for the city in its corporate or business capacity, the municipality may be held liable; but if they were performing duties of a public or governmental character, there is an immunity from municipal liability."

But of what type of rubber is the fence built which divides the governmental acreage of a municipality from its corporate or business acreage? An excursion through the Pennsylvania State Reports will show that this fence is one of extreme mobility and elasticity. The reason for such flexibility in the application of certain principles of law to established circumstantial situations is undoubtedly due to the fact that here and there judges seek to break the strait jacket of arbitrary precedent, and apply reason and logic to situations which demand moral justice. These judges refuse a stultification of principle in blind adherence to insupportable precedent and intolerable anachronism.

In the *Scibilia* case the plaintiff was injured by a city truck loaded with ashes which were being conveyed

to a municipal dump. The plaintiff recovered a verdict but it was reversed by the Superior Court, and the decision of the Superior Court was then affirmed by this Court. Chief Justice MOSCHZISKER, who wrote the Supreme Court's decision, said that Scibilia was without remedy because the City, in hauling ashes to the municipal dump, was engaged in a governmental function, not a corporate, proprietary function. The gathering of ashes and refuse was declared to be in the interests of good health: "That cleanliness makes for health must be accepted as a truism; and that the regular, systematic gathering by municipalities of refuse, including ashes, and the proper, orderly and efficient disposal thereof promotes cleanliness, is apparent. Such gathering and disposal of refuse is primarily a health measure, the duty to perform which might have been placed on the health department; the fact that it was put elsewhere makes it none the less a health measure, and, hence, a public or governmental function within the police power."

But in the case of *Hill v. Allentown Housing Authority*, 373 Pa. 92, this Court held that one injured on a refuse dump maintained by the Housing Authority of the City of Allentown *could* recover damages. While the Court explained that "the maintenance of the dump was not necessary to carry out the legislative mandate of providing dwelling accommodations for persons of low income," it did not explain how the transportation of refuse *is a governmental function* but the depositing of refuse on a refuse dump transforms the operation into *a corporate or business function*. Keeping in mind the rationalizing in the *Scibilia* case, how is the *gathering* of refuse a health measure, but the *disposal* of it not a health measure?

Although the *Allentown* decision was handed down on March 23, 1953, this Court only two months later

(May 25, 1953) took a still different view of what constituted a governmental function and what made up a proprietary function of a municipal corporation. There, (*Kunz v. Titusville,* 373 Pa. 528) the plaintiff, Martin J. Kunz, was seriously injured by falling into the hot ashes of an incinerator plant maintained by the City. This Court reversed the plaintiff's verdict of $10,000 on the ground that since the collection of garbage and rubbish in the city of Titusville was a governmental function, its incineration was also governmental: ". . . since the incinerator is the instrumentality for accomplishing that purpose [the disposal of ashes and refuse], there is obviously no escape from the conclusion that any accident which occurs in connection with the operation of the incinerator imposes no liability upon the municipality."

But in the case of *F. J. Kress Box Co. v. Pittsburgh,* 333 Pa. 121, this Court in a *per curiam* opinion, held that the erection and operation of an incinerator plant was an operation in the *"proprietary capacity"* of the City of Pittsburgh.

Although this Court cited with *approval* the *Kress* decision in the *Allentown* case, it summarily *repudiated* it in the *Titusville* case!

In 1941 the Superior Court of Pennsylvania declared (*Krepcho v. Erie,* 145 Pa. Superior Ct. 417) that in operating the city's sewage disposal plant, the City of Erie was exercising a proprietary function and not a governmental function. This Court also denounced the *Krepcho* decision in the *Titusville* case, declaring that both the *Krepcho* and the *Kress* decisions were without justification "in view of the decision in the *Scibilia* case."

But in the sea of modern decisions, the *Scibilia* case is no longer a trustworthy lighthouse. While hauling

130

ashes and garbage is undoubtedly an operation designed to conserve the health of the community, there are other operations dedicated to the promotion of health which the Courts have held to be demonstrations of corporate and proprietary power rather than governmental power. The maintenance of public parks is decidedly an operation intended to benefit the health of the people. From time immemorial the laying out and maintenance of public parks has been a governmental responsibility. Yet, in the case of *Honaman v. Philadelphia,* 322 Pa. 535, the plaintiff Honaman who was struck by a baseball in Fairmount Park, was allowed to recover in a suit against the City of Philadelphia because, as this Court said, "the city acts in its corporate or proprietary capacity in maintaining its parks."

Many municipalities, under lawsuit because of accidents resulting from municipal activities, point to the *Scibilia* case as a protector against liability. But in *Reichvalder v. Boro. of Taylor,* 322 Pa. 72, this Court, in renouncing the municipality's contention that the use of a road scraper was a governmental function, said through Justice SHAFFER: "We doubt the wisdom of extending the rule [of the *Scibilia* case] to cover such a situation."

Chief Justice MOSCHZISKER himself dimmed some of the lamps in the Scibilia lighthouse by stating: ". . . it must be admitted that in these days, when governments are constantly assuming new duties for themselves and putting additional powers at the disposal of their agencies, the demarcation between what are purely public functions within the police power and what are not, is becoming increasingly difficult to observe."

Nor does the Scibilia lighthouse offer much aid to navigators in the law when Chief Justice MOSCHZISKER points out that much of the illumination in the prece-

dents does not come from the lamp oil of logic: ". . . we must also notice that in several of our opinions we have taken occasion to point out that the decisions, fixing municipalities with responsibility for damages in this particular kind of case [construction and maintenance of highways], are in a class by themselves, depending more on long established precedent *than on fixed rules or pure logic.*"

Is the maintenance of sewers a governmental function or a corporate function of a municipality? Certainly, if the reasoning in the *Scibilia* case is valid, the operation of the sewers is a government function because indubitably the proper disposal of sewage is one of the most vital operations for the preservation of the health of any community. Yet, this Court held in *Gemmill v. Calder*, 332 Pa. 281 and in *Williams v. Samuel*, 332 Pa. 265, that "sewers are owned by municipalities in their proprietary capacity, not governmentally."

If municipalities are free from liability, under the theory of governmental functions, in hauling garbage, why are they not free from liability in the construction, maintenance and repair of streets? On what basis of common sense can it be said that the maintenance of highways and roads, the very arteries of the body of the Commonwealth, is not a governmental function, but the hauling of garbage is a governmental function?

If Leon Hartness had escaped the fall of snow from the roof of the courthouse and had later tripped over that same snow in the street in front of the courthouse (provided it had formed into ridges) he could then sue the City for negligence in maintaining the streets. What type of legal logic is it that can hold a governmental subdivision liable for an accumulation of snow on the street where it at least can be seen by a pedestrian but denies recovery when the governmental sub-

division throws it down on his head from an elevated embattlement?

What kind of law and justice is it that says the hauling of refuse is a matter of preserving the health of the community and then in that operation cripples Giuseppe Scibilia, leaving him writhing on the streets without redress? What about *his* health?

What fairness and right dealing in law is it that approves the adage there is no wrong without a remedy, but yet leaves Martin J. Kunz remediless on the hot ashes of the incinerator in Titusville because the destruction of garbage is a governmental function?

It is because of these amazing inconsistencies in the decisions of our Court and in other Courts that Mr. Chief Justice HORACE STERN referred to the conflicting cases as a "welter of decisions." (*Hill v. Allentown,* supra)

Mr. Justice LINN, in the case of *Honaman v. Philadelphia,* 322 Pa. 535, 537, remarked: "The distinctions in the law determining tort liability of municipal corporations arising out of the exercise, on the one hand, of so-called governmental functions, and, on the other, of corporate or proprietary functions, have long been *in a state of confusion and uncertainty* which the courts are powerless to correct . . ."

In *Cousins v. Butler County,* 73 Pa. Superior Ct. 86, 94, President Judge KELLER said that the distinction between governmental functions and proprietary activities on the part of municipalities in many instances "undoubetdly remains and rests upon precedent, if not principle."

In *Briegel v. Philadelphia,* 135 Pa. 451, Mr. Justice MITCHELL said: "Nor is the distinction between the cases where municipal corporations have been held liable and where they have not [been] entirely logical or obvious."

As far back as 1888, the Chief Justice of the Supreme Court of that era, Chief Justice Isaac G. Gordon pointed out, in discussing the liability of municipalities for the negligence of their officers in the construction and maintenance of streets and highways, that "the reason for this rule is not very obvious." He then went on to say, however, that "we are not disposed to quarrel with decisions, or unsettle old and well-established rules." I cannot accept that philosophy. If the kernel of a decision is wrong, the accumulation of years may cover it with the moss of veneration but never impart to it the flavor of wisdom.

Advocates of the immunity doctrine have argued that to hold the government responsible in tort actions would impose a great burden on the government's treasury. Such an argument offends against logic almost as much as it does against honorable conduct in the affairs of man. To say that everyone should be held liable for his wrongs except the government is to argue for a double standard of morality that is simply intolerable in a democracy.

Nor would government tort responsibility impose the crushing burden these alarmists would portend. Railroad, street car, taxicab, road building and construction companies are defendants on a much larger scale than a governmental subdivision would ordinarily be. And as the costs of trespass litigation are absorbed into the normal operation costs of a private corporation, they could and would be added to the budgets of governmental subdivisions and municipal corporations.

It has even been suggested that with governmental tort responsibility, the number of suable accidents would increase. Allowing for a certain amount of cupidity and covetousness in mankind, (a fact no one denies) I refuse to accept that, because of a newly acquired right to recover for personal and crippling

injuries, a large segment of the population would throw itself in front of garbage trucks, tumble into incinerating plants and stand under roof-discharging ice avalanches so as to obtain money for pain and crutches for broken legs.

A grave and solemn responsibility rests, as I view it, on the Supreme Court of Pennsylvania, to bring order out of confusion, logic out of sophistry, reason out of pedantry, law out of dogma, and justice out of injustice. While legislative intervention would be welcome, it is not imperative, nor indeed preferable to judicial clarification. I do not mean by this that the courts should ever bring into being rights and liabilities not already in the body of the law through statutory or common law creation. Judicial legislation, I have had occasion to say more than once as a member of this Court, is a usurpation of powers, but there is no possibility of any intrusion into the jurisdiction of the General Assembly in our doing what I believe is required here. We have seen that governmental responsibility for accidents arising out of negligence in the construction and maintenance of streets and highways is not a matter of statutory mandate. We have observed illustrations of municipal liability resulting from "historic reasons" rather than from "general rules or by the process of legal or logical deductions therefrom." (Chief Justice MOSCHZISKER in *Scibilia,* supra, p. 556).

The field is already open for action by this Court. Nor is it a matter of cataloging precisely under what circumstances the government is responsible for the negligent acts of its agents, employes or representatives. It would be enough to declare, as in the case before us, that where the Complaint avers circumstances which, if believed, would require the governmental subdivision to offer an explanation, the municipality

involved should be compelled to produce that explanation before a jury.

The plaintiff in this case, Herbert C. Boorse, is entitled to know how and why two men carrying every indicia of authority of their respective masters, specifically, Springfield Township and Upper Dublin Township, destroyed his property. Chief Justice SHARS-WOOD very properly stated in the *Fields v. Stokley* case, supra, that the official position of the defendant there (mayor of Philadelphia,) did not per se relieve him from personal responsibility for ordering the destruction of the plaintiff's property simply because he claimed it was a fire hazard. The jury however sustained his position and he was thus justified in his "alleged trespass." But no jury has exculpated the two Townships here from responsibility for the death of All's Over. Nor, as I view it, has reason, intrinsic justice or the law itself cloaked with vindication the action of the lower court in sustaining the preliminary objections which summarily ousted the plaintiff from Court. It was not only Herbert C. Boorse who was rebuffed by that eviction. The rights of personal property generally have sustained an equally staggering blow by the decision in this case.