## Jenkins Sportswear v. City of Pittston

*N. R. Degillio, William A. Degillio,* for plaintiffs.

*J. Justin Blewitt, Frank Flanagan* and *Robert A. Hourigan,* for defendants.

TREMBATH, J. (Specially presiding), March 7, 1960. —This action was heard in equity on bill and answer which raised issues as follows: (1) Should the City of Pittston and Patrick J. O'Brien its mayor, and John

Korick, its chief of police, or any of them, be enjoined preliminarily to hearing and permanently thereafter from padlocking plaintiff's factory premises in the City of Pittston and from maintaining the said padlocks in place; (2) is plaintiff entitled to damages against the said defendants or any of them.

## Findings of Fact

1. Plaintiff, Emanuella Falcone, trading as Jenkins Sportswear, is a manufacturer of garments having a factory at 119 South Main Street, Pittston.

2. Defendants are the City of Pittston, Patrick J. O'Brien, individually and as mayor of the City of Pittston, and John Korick, individually and as chief of police of said city.

3. Plaintiff in the operation of her factory, begining February 27, 1959, got into difficulty with the International Ladies Garment Union. Some 30 or more of a total of 40 to 50 of plaintiff's employes went out on strike and picketed plaintiff's premises. The number of pickets varied from time to time between 12 and 35. These pickets at times solidly blocked the sole access to plaintiff's factory from the street, assaulted plaintiff's employes, who were trying to enter, and made entry or exit from the factory difficult or impossible without physical contact between the working and striking employes. Trouble of this nature occurred daily. In addition to the physical contact, the striking employes used vile and abusive language towards the nonstrikers, and during working hours they banged on the factory windows, jumped up and down on steel trap door, massed their pickets so as to block the nonworkers. Actual riots broke out between the strikers and nonstrikers on at least two occasions, April 1 and April 10, 1959.

4. From February 27th to April 12th, police protection was furnished when called for, if the police were available, but they were not removed from their

routine duty of protecting school children going to and from school in order to furnish such protection. During this period there were disturbances but chiefly when the police were not present.

5. From April 12th to April 19th, police were present at the factory at all times during working hours and there were no disturbances or riots.

6. Sometime between April 13th and April 18th, the mayor asked plaintiff to sit down and bargain with the union and plaintiff refused; the mayor then threatened to board the place up.

7. On April 19th on order of the mayor, the chief of police caused padlocks to be placed on plaintiff's premises and stationed a 24-hour police watch to see that the padlocks were not removed.

8. Plaintiff's place of business is located on Main Street directly opposite the Jenkins Bridge over the Susquehanna River. Because of the wide approaches to the bridge on the river side of Main Street, a sidewalk is maintained for pedestrian traffic only, upon the side of Main Street upon which plaintiff's factory fronts.

9. Each of the disturbances at plaintiff's factory created annoyance to pedestrians, and on some occasions the pedestrians had to walk in the street.

10. The padlocks were removed on December 3, 1959.

11. During the period the padlocks were in place, plaintiff asked and received permission to enter and did enter her factory a number of times for particular purposes such as the repairing of damaged water lines, draining water lines, taking a machine from the premises, and removing finished goods.

12. During the period the premises were padlocked, plaintiff's machinery was damaged by rust through nonuse in an unheated building.

13. Plaintiff at the time her factory premises were padlocked was engaged in manufacture under contract of 564 dresses, only 60 of which she was able to complete.

14. The rental paid or incurred by plaintiff during the period the premises were padlocked was $1,312.50. Further, because of the padlocking, plaintiff incurred expenses for shutting off and turning on water of $37.

15. By reason of the rust damage to plaintiff's machinery, she suffered damage in the sum of $1,000, the cost of repair.

## Discussion

We can easily dispose of the liability of the City of Pittston. A municipality is immune from liability for a tort committed by its officers *when they are acting within the scope of their authority* if the act which they are performing is governmental in character as opposed to an act done in the proprietary or business capacity of the municipality.

" 'It [the law] distinguishes between the acts of municipalities done in their proprietary or business capacity and those which they perform as functions of government delegated by the State. As to the former, the doctrine of respondeat superior applies; as to the latter, it does not.' Of course, police officers perform essentially a governmental function. It is true that municipalities are not clothed with immunity in certain cases, such as those involving highway construction, the building of public works, or the maintenance of a nuisance; these are well established exceptions to the rule and as such are explained in Scibilia v. Philadelphia, 279 Pa. 549, 555, 556, 124 A. 273, 275, 276": Boorse v. Springfield Twp., 377 Pa. 109, 112.

The mayor and the police, if they acted within the scope of their authority at all, were performing a governmental function.

There is a second reason that the City of Pittston is not liable if the officers were acting within the scope

of their authority. The mayor of the city while exercising police functions, and all of the police of the city while exercising police functions, are the agents not of the city but of the State, and so if the doctrine of respondeat superior applied at all it would be the State of Pennsylvania that was liable and not the City of Pittston.

"'Police officers appointed by a city are not its agents or servants, so as to render it responsible for their unlawful or negligent acts in the discharge of their duties, and, accordingly, a city is not liable for an assault and battery committed by its police officers, though done in an attempt to enforce an ordinance of the city; nor for an arrest made by them which is illegal for want of a warrant; nor for their unlawful acts of violence, whereby, in the exercise of their duty of suppressing an unlawful assemblage of slaves, the plaintiff's slave was killed. So, on the same principle, a person who suffers a personal injury while aiding the police officers of a city, at their request, in arresting disturbers of the public peace under a valid ordinance has no remedy against the city. The municipal corporation in all these cases represents the state or the public; the police officers are not the servants of the corporation, and hence the principle of respondeat superior does not apply'": Miller v. Hastings Borough, 25 Pa. Superior Ct. 569, 572-73.

The city is not liable if the mayor and the chief of police were *not* acting within the scope of their authority.

". . . nor is it conceivable how any blame can be fastened upon a municipal corporation, because its officer, who is appointed or elected for the purpose of causing to be observed and carried into effect the ordinances duly passed by the corporation for its police, either mistakenly or wilfully, under colour of his office, commits a trespass; for in such case, it cannot

be said, that the officer acts under any authority given to him, either directly or indirectly by the corporation; but must be regarded as having done the trespass of his own will, and he alone must be looked to for compensation, by the party injured": Boorse v. Springfield Twp. 377 Pa. 109, 111. See also annotations 101 A. L. R. 1166.

As to the liability or nonliability of defendant mayor and chief of police, the basic question which must be determined is: Were defendants mayor and chief of police acting within the scope of their authority and jurisdiction when they padlocked plaintiff's premises and prevented plaintiff from removing the padlocks? If they were so acting within the scope of their authority, they are immune from suit. On the other hand, if they exceeded their power, they are liable for their tort, and further interference by the said officers with plaintiff's premises *must be enjoined.*

"If a public officer in the exercise of an authority deviates from the authority given by law, by doing more than is permitted, or by doing it otherwise than he is directed, he may be amenable for such unauthorized acts, be his motives what they may; but so long as he acts within the sphere of his authority the motives or the cause of his doing so are in a legal point of view not examinable."

"The only question was whether the defendants had authority to do the act complained of, and if they had they stood clearly justified." The Mayor v. Randolph, 4 W. & S. 514.

"The public officer is protected, however, only while acting within the limits of his authority. If under the colour of his office he exceeds the power which the law has conferred upon him, he cannot shelter himself under the plea that he is a public agent. The first question in any case brought against him therefore, is whether he had legal authority for the acts com-

plained of and indeed it was held in The Mayor v. Randolph, 4 W. & S. 514, that no other question could arise. . . .

"There is no small reason for holding that the liability of a public agent to make or repair a highway for damages caused by his acts, done in pursuance of his public trust, should not begin until he has transcended his powers. In most of the cases the suitor against him complains of a nuisance. Whether an act done be a nuisance or not involves always the inquiry whether it was contrary to law. It cannot be a nuisance if legally authorized, and to the inquiry whether legally authorized or not, the motives of the actor are quite irrelevant." Yealy v. Fink, 43 Pa. 212, 216.

In examining the police power of defendant officers it is well to have in mind the rights of the property holder. "An owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and property. These include a right to use his own home in any way he desires, providing he does not (1) violate any provision of the Federal or State Constitutions; or (2) create a nuisance or (3) violate any covenant, restriction or easement; or (4) violate any laws or zoning or police regulations which are constitutional": Medinger Appeal, 377 Pa. 217, 221.

"A municipality cannot, without condemnation, completely shut off an abutting owner's access to his land, particularly pedestrian access": Breinig v. Allegheny Co., 332 Pa. 474, 481.

"The right of an owner to devote his property to any legitimate use is within the protection of the Federal Constitution: Seattle Title & Trust Co. v. Roberge, 278 U. S. 116. This right is not without limitation. The right to use property for any legitimate purpose as an attribute of ownership is not absolute or unrestricted; it is subject to a superior claim of the public, provided that claim is not unreasonable, and

has a necessary relation to health, safety, morals, and general welfare of the public. When it has such relation, its use for a particular purpose may be regulated or prevented under the police power.

"A further limitation on the right of an owner to do as he wishes with his land is that which prevents a use that injures a neighbor's property (Penna. Co., etc., et al. v. Sun Co., 290 Pa. 404, 408), as where an owner establishes or attempts to establish a business or use which in itself is a nuisance, when conducted in a given locality, or becomes so because of the manner in which it is conducted": Perrin's Appeal, 305 Pa. 42, 48.

"Police power cannot be exercised by any group or body of individuals who do not possess legislative power; a municipality, through a council, may and usually does possess legislative power within the authority conferred. Administrative officers or a group of citizens do not and cannot possess such power": Perrin's Appeal, supra, p. 49.

Defendant officers have attempted to support their action under the broad scope of the police power, but because this power is legislative they must point out an act of assembly or ordinance of council as the source of that police power. "The police power by its very nature is governmental and its exercise, whether by state or municipality must always be regarded as done in a governmental capacity. The power, moreover, can be exercised only by a legislative body or directly by the electorate in a democracy where all legislative power is vested in the people or their legislature." 6 McQuillan Municipal Corp. (3d ed.) §24.02.

The statutory duties of the mayor are found in the Third Class City Code of June 23, 1931, P. L. 932, as amended, sec. 1203:

"It shall be the duty of the mayor to be vigilant and active in causing the ordinances of the city, and

the laws of the Commonwealth relating to the government of the city, to be executed and enforced. In order to enable him effectually to preserve the public peace within the city, all the powers which are devolved by the laws of this Commonwealth upon sheriffs, to prevent and suppress mobs, riots, and unlawful and tumultous assemblies, are hereby conferred upon him": 53 PS §36203.

The power to summon a posse comitatus is "the power which is devolved upon a sheriff to suppress riots . . .," which, in turn, was conferred by Third Class City Code upon the mayor.

"The sheriff must immediately summon the power of the County, the *posse*, every able bodied man if necessary, a less number if sufficient.

"When the power of the county is convened, the legal means which the law requires the sheriff to use, are every means, physical and moral, which his array puts at his command, and the occasion requires. In enforcing the laws it is hard to say what a sheriff may not do." In re Riots, 2 Clark 135, 139; Person Sheriff v. Northampton County, 19 Dist. R. 691, 694.

Defendants do not assert that plaintiff has violated the Constitution of the State of Pennsylvania or of the United States of America or any act of the assembly of the State of Pennsylvania or any ordinance of the city. They do assert: (1) plaintiff's business was so conducted as to constitute a nuisance and that, therefore, they had the right to abate the nuisance, and (2) that defendants had the right to padlock the premises and maintain the padlocks in place as a part of their power in suppressing a riot.

Defendant's actions cannot be supported as an abatement of a nuisance. The Third Class City Code makes two provisions for the abatement of nuisances. Neither the mayor nor the chief of police, nor both officers acting jointly are given power to act without,

in the one case, the board of health, and, in the other case, the city council. Both provisions give the owner of the property proposed as a nuisance his day in court before abatement.

53 PS §37320-4. These sections give the board of health the power to declare the nuisance, direct that the owner be given notice and provide for a hearing and after hearing an appeal to the court of quarter sessions before abatement.

53 PS §39140 gives the mayor, after resolution by city council, the right to petition the court of common pleas to abate the nuisance.

The mayor and the chief of police have the same right as any citizen to abate a public nuisance. It may well be that the mayor as the first citizen of the city has an earlier duty to act than any of the other citizens. However, in such case the mayor, like any private citizen, must satisfy the court that a public nuisance did in fact exist: Fields v. Stokely, 99 Pa. 306.

The evidence does not establish that the building was in and of itself a public nuisance, nor that the activities conducted therein constituted a nuisance in fact. Defendants have not suggested that the building was in and of itself a public nuisance. They do suggest that plaintiff's attempt to conduct a business in the face of labor difficulties constituted a nuisance in fact within the ruling of Reid v. Brodsky, 397 Pa. 463. Plaintiff conducted her business as a manufacturer of garments without any incident until part of her employes went out on strike. Thereafter, she attempted to conduct her business in the same premises in the same manner. The presence of 10 to 35 pickets created many disturbances, but plaintiff was doing nothing unlawful in attempting to conduct her business. The actions of the pickets were riotous on many occasions and on two occasions plaintiff's employes took part in the riots.

In Wilson & Co. v. Freeman, in the District Court of the United States, 4th Division, the court said:

"(1) No one will disagree that a serious situation existed at or near plaintiff's plant at Alberta Lea when strikers and their sympathizers sought by mob violence to prevent some 400 persons from carrying on their lawful employment with plaintiff. Obviously, however, plaintiff was within its rights, notwithstanding the strike, in attempting to keep its plant in production and to afford employment to those persons who were willing to work. Plaintiff is protected by the Constitution of the United States in its right to possess its property and to use it in any lawful manner that it may desire to pursue. Plaintiff cannot be held responsible for mob violence which was allegedly precipitated by its attempt to keep its plant open." The court held that the Governor of Minnesota had no power under the guise of martial law to close the meat packing plants of plaintiff because of acts of violence occurring during and as a result of the operation of the plant with new employes during a strike. That court said:

"Moreover, we recognize that the courts should proceed cautiously before interfering with the acts of a Governor of a Sovereign State in determining that martial law is necessary in the state of which he is the chief executive, and commander in chief of the armed forces of the state. We are mindful of the necessity of preventing bloodshed and that property rights must at times be sacrificed in order to prevent the spilling of blood. But a free people do not surrender to mob rule by the expedience of martial law until all means available to the city, county and state to enforce the laws have proved futile."

We feel that the acts of the chief executive of the City of Pittston in preventing bloodshed should be as carefully examined. Did he use all means available to

the city, county and State to enforce the laws before he sacrificed or attempted to sacrifice plaintiff's rights of property?

We have no hesitancy in saying that he did not.

The mayor was most certainly confronted with riots and tumultuous assemblies. The fact that the mobs, rioters and those assembled in tumultuous assemblies acted in the name of a labor dispute did not make them less riotous or tumultuous or more lawful: Commonwealth v. Apriceno, 131 Pa. Superior Ct. 158; Commonwealth v. Brletic, 113 Pa. Superior Ct. 508; Commonwealth v. Merrick, 65 Pa. Superior Ct. 482; Commonwealth v. Paul, 145 Pa. Superior Ct. 548; Commonwealth v. Duitch, 165 Pa. Superior Ct. 187.

Not only did the mayor fail to cause the arrest of a single rioter, but he failed to proceed against rioters that were in fact arrested on view by his officers, and censured the officers for the arrest so made. Except during the period April 12th-19th, he did not assign police to the troubled areas unless called upon, and not then when his police were engaged in ordinary daily duties. He did not hire extra police except after April 12th, asserting that the city could not afford such an expenditure. He did not call for aid of the sheriff. He did not exercise his power to summon a posse comitatus, and he did not call upon the State Police for assitance. He tried to avoid the necessity of any action by his police department by referring plaintiff to the courts for a remedy instead of supplying police protection.

After the most serious of the riots he did supply police protection beginning April 12th and maintained that police protection from April 12th until April 19th. During this period there was no riot nor tumultuous assembly. After a week's experience in maintaining peace and order in the manner provided by law, he wearied of this effort, and, at a time when there had

not been any public disturbance in the neighborhood of plaintiff's premises for one full week, he padlocked plaintiff's premises and thus kept plaintiff and all other persons from having access to that property.

This is not evidence "that all means available to the city to enforce the law, had been proved futile." The evidence was to the contrary, namely: that the mayor could, if he would, enforce the laws with ease.

Thus, it is clear that defendant mayor and chief of police clearly failed to use the ordinary means of police protection at their disposal to quell riots and put down tumultuous assemblies, and instead used means which were not available to them at a time when no riots existed, and in so doing exceeded their police power.

There is a no man's land in cases raising the question of whether the public officer acted within the scope of his authority. The no man's land is expressed in 43 Am. Jur., Public Officers, §277 as follows:

"In this connection a careful distinction must be drawn between erroneous acts in the exercise of jurisdiction or authority and acts in excess of jurisdiction."

This no man's land, referred to in Spalding v. Vilas, 161 U. S. 483, 498, 16 Sup. Ct. Rep. 631, 637, is expressed as follows:

"We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. As in the case of a judicial officer, we recognize a distinction between action taken

by the head of a Department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision."

Judge Learned Hand in Gregoire v. Biddle, 177 F. 2d 579, 581, on this subject, says:

"The decisions have, indeed, always imposed as a limitation upon the immunity that the officer's act must have been within the scope of his powers. . . . What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him."

And this was quoted with approval in Papagianakis v. The Samos, 186 F. 2d 257, 261, 262.

We think that the meaning of the limitation of the immunity doctrine as expressed by Judge Learned Hand supplies a workable formula for deciding whether the public officer's act complained of falls within or without the scope of his powers. Applying that measure to the case before us, we find that the occasion, in the dark of the night one week after the last riot, was not such as justified the act of padlocking plaintiff's premises even though he did believe that the act was done in connection with possible future riots. Neither were the occasions when plaintiffs were barred from access for months after all rioting had ceased such as justified the act of forcibly continuing the presence of the padlocks.

Defendants have made point of the fact that plaintiff hired persons with known criminal records as her employes. This court takes the position that rioters cannot be classified as good rioters and bad rioters. It is not more wicked or more unlawful for a person with a criminal record to take part in a riot than it

is for a Sunday school superintendent to so take part. The fact that the persons with criminal records joined in the riots increased the danger and the resultant necessity that the mayor act within his power and cause the arrest of the rioters either by his own police or by a posse comitatus.

There is no doubt that the padlocking of plaintiff's premises did stop the riots and all disturbances at plaintiff's plant. Neither is there any doubt that the disturbances would have ceased if the mayor or chief of police had arrested plaintiff and all her employes and committed them to jail. The point that is made is that the said officers had no more power to padlock plaintiff's premises because she attempted to operate her plant in the face of a labor disturbance than they did to arrest plaintiff and her employes for the same reason. Even it it be assumed as a fact that the padlocks were applied during an emergency caused by a riot, it cannot be asserted that that emergency lasted from April 19th to December 3rd. If the padlocking could have been justified to save bloodshed at the height of the riot, the padlocks would have had to be removed when the forces of law and order had again gained control.

We condemn with the utmost severity the abdication by the police authorities here involved of their power and duty to control the mob violence which attended and surrounded this strike. The courts of this State have said time without number that only peaceful picketing is lawful picketing, and, that mass picketing is unlawful. For the police authority and executive of the City of Pittston to refer plaintiff to the courts for protection is complete and abject abdication of the duties which defendants have on their solemn oaths assumed. It is true that plaintiff had a remedy in the courts for all civil and criminal violations of her rights. It is likewise true that the execu-

tive branch of the city government was bound at all cost to maintain peace.

Defendants argue that during the preliminary hearing Judge Flannery advised the parties and counsel: "The court has jurisdiction of this now" and that thereafter none of the parties had the right to act independently, and that consequently damages occurring after that date could not be attached to defendants.

It is ridiculous to claim that the court maintained the padlocks after the preliminary hearing. The court of its own motion has no power to maintain padlocks: Petition of Communist Party, 365 Pa. 549. In fact, no court has power to act except at the instance of a suitor.

The fact is that the court acted at the instance of a suitor. The defendant mayor said the padlocks will "be on there as long as until this court or some other court tells me to remove them." Defendants' counsel at the close of the preliminary hearing said: "The defendants now request that the rule to show cause why the preliminary injunction should not be granted . . . be dismissed."

Plaintiff is entitled to recover damages from defendants Patrick J. O'Brien and John Korick. There can be no doubt that plaintiff lost the use of the premises, the rental value of which was $1,312.50 for the seven and one-half months the premises were under padlock. Plaintiff also incurred expenses in turning off and turning on water in the amount of $37. Defendant claims that these damages were not pleaded and are, therefore, not recoverable. These damages are not special damages but are general damages and do not have to be pleaded to be recovered: Parsons Trading Co. v. Dohan, 312 Pa. 464, 468.

Plaintiff seeks to recover for the damage to her machinery because of rust which accumulated by its dis-

use in an unheated building. Plaintiff was permitted access to the building for many purposes, such as draining and repairing water lines, taking a machine from the premises, removing finished goods. There is nothing to indicate that she did anything to prevent the rust or to minimize this damage. Since permission to enter the building for all purposes short of manufacture seems to have been granted, the proper measure of damage here would have been the cost of having the machines serviced from time to time. No such measure was proven and the court cannot grant these damages except by speculation and, consequently, recovery to compensate for this loss is refused.

Plaintiff also seeks to recover for her loss by reason of her inability to complete her contract to manufacture 564 dresses at $1.65 per dress and for her future loss because of her breach of contract. These damages are special and must be pleaded. If we assume that paragraphs 13, 14, 15 and 16 of the complaint sufficiently pleaded these items of damages, which is extremely doubtful, nevertheless plaintiff may not recover her loss because there was not sufficient evidence from which the court could assess the damage. Plaintiff was entitled to receive $1.65 per dress completed and delivered, but there was no evidence as to her cost of manufacture or of delivery. There was evidence that the completed dress would have a market value of $5.75, but this is not clear. Not only was the total value of the completed garment left dangling but it was admitted that the completed garment had some value even though sold out of season. No evidence of this salvage value was offered. The result is that the damage for these items was not proven and, without such proof, cannot be allowed.

The remaining question is whether the court should enjoin future interference by defendants. No court has as yet held that there are absolutely no circumstances

under which a property may be seized by police to prevent bloodshed. Neither has any court yet decided, so far as we are able to discover, the exact circumstances under which seizure of property to prevent bloodshed is permissible. Under no circumstances can plaintiff be deprived of possession of her property after the emergency for which it was seized has passed. We further hold that possession of plaintiff's property cannot be seized by defendants even to prevent bloodshed, until all other means available to prevent bloodshed have been used and found ineffective.

The court concludes as a matter of law:

1. That plaintiff's bill must be dismissed as to the City of Pittston.

2. That defendants Patrick J. O'Brien, mayor of the City of Pittston, and John Korick, chief of police of said city, acted beyond the scope of their authority in padlocking plaintiff's factory and in maintaining the padlocks in place from April 19 to December 3, 1959.

3. That plaintiff is entitled to recover from defendants Patrick J. O'Brien and John Korick the sum of $1,349.50.

4. That plaintiff is entitled to an order enjoining defendant mayor and chief of police from illegally seizing and holding possession of plaintiff's property.

### Decree Nisi

It is ordered, adjudged, and decreed that plaintiff's bill against the City of Pittston is dismissed; that the prothonotary enter judgment in favor of Emanuella Falcone, trading as Jenkins Sportswear and against Patrick J. O'Brien and John Korick in the sum of $1,349.50; that the said Patrick J. O'Brien and John Korick be and they are enjoined from illegally seizing and illegally holding possession of plaintiff's factory premises.

This decree nisi shall be final as of course unless exceptions are filed within 20 days after notice hereof. The prothonotary is directed to notify forthwith the parties hereto and their counsel of the entry of this decree.