Laughner, Appellant, *v.* Allegheny County.

Argued March 25, 1969; reargued October 1, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Louis J. Grippo,* with him *Louis C. Glasso,* for appellant.

*John David Rhodes,* with him *Thomson, Rhodes & Grigsby,* for appellee.

OPINION PER CURIAM, January 30, 1970:
Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:
Eleven years ago this Court stated: "The errors of history, logic and policy which were responsible for the development of this concept [of governmental immunity] have been clearly exposed, and thoroughly criticized." *Morris v. Mt. Lebanon Township School District,* 393 Pa. 633, 635, 144 A. 2d 737, 738 (1958)

(footnotes omitted). Nevertheless, this Court refused to remedy the situation, which was created by the courts themselves,* but instead called on the Legislature for help. Since then, a majority of this Court has continued to perpetuate the doctrine, while at the same time, it has continued to call on the Legislature for help. See, e.g., *Supler v. North Franklin Township School District*, 407 Pa. 657, 660, 182 A. 2d 535, 537 (1962) ("[T]he change should be made by the Legislature and not by the courts.") ; *Stouffer v. Morrison*, 400 Pa. 497, 502, 162 A. 2d 378, 381 (1960) ("This case once again demonstrates the urgent need for legislative action.") (concurring opinion). Needless to say, the Legislature has not responded. Today, the majority of this Court has even stopped calling for help.

The doctrine of governmental immunity is constantly being rejected by other courts, and it is long past the time for this Court to do likewise. The list of cases in which the immunity has been rejected includes: *Carrol v. Kittle*, 203 Kan. 841, 457 P. 2d 21 (1969) (overruling *McCoy v. Bd. of Regents*, 196 Kan. 506, 413 P. 2d 73 (1966), which held that it was up to the legislature to change the law) ; *Brown v. City of Omaha*, 183 Neb. 430, 160 N.W. 2d 805 (1968) (citing cases) ; *Brinkman v. City of Indianapolis*, 231 N.E. 2d 169 (Ind. Ct. App. 1967) ; *Myers v. Genesee County Auditor*, 375 Mich. 1, 133 N.W. 2d 190 (1965) (holding no governmental immunity for county) ; *Walsh v. Clark*

---

* See *Dillon v. York City School District*, 422 Pa. 103, 105, 220 A. 2d 896, 897 (1966) (citing *Russell v. Men of Devon*, 2 T.R. 667, 100 Eng. Rep. (1788)). The doctrine of governmental immunity must be distinguished from the doctrine of sovereign immunity. The latter applies only to suits against the Commonwealth and is expressly created by our constitution. See Pennyslvania Constitution Art. I, §10; see also *Dillon*, 422 Pa. at 108, 220 A. 2d at 899 (concurring opinion).

*County School District,* 82 Nev. 414, 419 P. 2d 774 (1966) (reaffirming *Rice v. Clark County,* 79 Nev. 253, 382 P. 2d 605 (1963), which abrogated immunity); *Stone v. Arizona Highway Commission,* 93 Ariz. 384, 381 P. 2d 107 (1963); *Haney v. Lexington,* 386 S.W. 2d 738 (Ky. 1964); *City of Fairbanks v. Schaible,* 375 P. 2d 201 (Alaska 1962); *Holytz v. Milwaukee,* 17 Wis. 2d 26, 115 N.W. 2d 618 (1962); *Spanel v. Mounds View School District,* 264 Minn. 279, 118 N.W. 2d 795 (1962); *Muskopf v. Corning Hosp. Dist.,* 55 Cal. 2d 211, 359 P. 2d 457 (1961); *Molitor v. Kaneland Community Unit Dist.,* 18 Ill. 2d 11, 163 N.E. 2d 89 (1959), cert. denied, 362 U.S. 968, 80 S. Ct. 955 (1960); *Hargrove v. Town of Cocoa Beach,* 96 So. 2d 130 (Fla. 1957).

Since this case is being dismissed at the pleading stage, we do not know whether plaintiff can prove her cause of action. But reading the complaint, and the attached exhibit, in the light most favorable to the plaintiff, as we must, plaintiff has recounted a most shocking, and harrowing, story of negligence.

Plaintiff is the mother of Carol Laughner; she is seeking to recover in an action for wrongful death. In October of 1966, Carol came to the attention of the juvenile authorities for the first time when she took some sleeping pills at school and stated she wanted to commit suicide. Over the next seven months, the authorities attempted to deal with Carol by placing her, at various times, in the Allegheny County Detention Home and in the Gilmary School. In December, a Dr. Hiller diagnosed Carol as being somewhat emotionally unstable with a hysterical character disorder. Although psychiatric examinations were planned in January, they evidently were never undertaken. During this time, Carol frequently ran away from whatever facility she was in, boasted about her suicide attempt, and complained about severe stomach pains. In February of 1967, Carol drank some turpentine and refused

the milk antidote. In March she reportedly took some quinine pills. Dr. Hiller again indicated that she had a hysterical character disorder and recommended psychological testing. The test was supposed to take place on March 16. It did not. On March 27, she swallowed a piece of glass and a tack. After this, there is some indication of a "psychological report" being filed with the juvenile authorities. The report indicated that the Job Corps was the best answer to Carol's problems.

On April 28, 1967, Carol was locked in her room at the Allegheny County Detention Home. The other girls were at supper and she was alone. With matches provided by an employee of the detention home, Carol set herself on fire. Infection and gangrene set in and on June 10, 1967, Carol died.

Dean Prosser has written: "The 'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infreqeuntly one reason for imposing liability is the deliberate purpose of providing that incentive." Prosser, Handbook of the Law of Torts 23 (3d ed. 1964).

By its decision today, the majority refuses to provide that "strong incentive to prevent the occurrence of harm." The county was under a duty to provide for Carol's care, yet we sanction the negligent way in which they provided that care. We refuse to use the historical tool at our disposal—tort law—to help prevent future abuses. Those who must accept the "benefits" of governmental action will continue to be faced with what Carol faced. And governmental units will be secure in their knowledge that they may act with impunity.

I see no way to justify such a result. This Court has already abrogated the doctrine of charitable immunity—despite the argument that only the Legislature could do so. See *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 520-21, 532, 208 A. 2d 193, 209, 210, 216 (1965) (dissenting opinions). There is no jurisprudential difference between abrogating charitable immunity and abrogating governmental immunity. With charitable immunity rejected, I can see no reason for the majority's refusal to likewise reject governmental immunity. Not once since *Flagiello* was decided has the majority even attempted to distinguish the two immunities. See *Harker v. D. & H. Building Wreckers, Inc.*, 429 Pa. 655, 241 A. 2d 73 (1968) (per curiam without opinion); *Husser v. Pittsburgh School District*, 425 Pa. 249, 228 A. 2d 910 (1967) (per curiam); *Dillon v. York City School District*, 422 Pa. 103, 220 A. 2d 896 (1966); *Graysneck v. Heard*, 422 Pa. 111, 220 A. 2d 893 (1966).

Surely this Court has permitted too many years to pass without correcting the injustices produced by its own doctrine. There is no reason to let more years pass, to let more injustices of this nature accumulate without correction.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

This appeal is from an order of the lower court sustaining preliminary objections in the nature of a demurrer to a complaint seeking wrongful death and survival damages in two stated causes of action. The defendant's demurrer was based on its assertion that the doctrine of governmental immunity barred the plaintiff's recovery for any alleged negligence, and on that ground the lower court reluctantly sustained the demurrer.

The appeal is a direct attack upon the doctrine of governmental immunity as it is presently applied to the counties of this Commonwealth. Like challenges to that doctrine have been presented to this Court on numerous occasions in the past, always without success. The perseverance of the doctrine of governmental immunity is attributable to two separate factors: first, the belief of some that the doctrine of immunity is a sound and viable rule of law; and second, the belief, even among detractors of the rule, that if the rule is to be abrogated, such change should be effected by the legislature. I am persuaded that neither position withstands analysis. I would reverse the order of the court below sustaining the preliminary objections, and hold that the plaintiff is entitled to a responsive pleading and such further proceedings as may properly follow.

## I.

It has long been the rule in this Commonwealth that a county is immune from liability for the tortious acts of its employees unless the alleged tort grows out of a "proprietary" function of the county or the county itself has consented to suit.[1] I shall not here detail the origins of or the traditional justifications

---

[1] See *Fox v. The Northern Liberties*, 3 W. & S. 103 (1841); *Elliott v. City of Philadelphia*, 75 Pa. 347 (1874); *Bucher v. Northumberland County*, 209 Pa. 618, 59 Atl. 69 (1904); *Balashaitis v. Lackawanna County*, 296 Pa. 83, 145 Atl. 691 (1929); *Hartness v. Allegheny County*, 349 Pa. 248, 37 A. 2d 18 (1944); *Boorse v. Springfield Township*, 377 Pa. 109, 103 A. 2d 708 (1954); *Morris v. Mt. Lebanon Township School District*, 393 Pa. 633, 144 A. 2d 737 (1958); *Stouffer v. Morrison*, 400 Pa. 497, 162 A. 2d 378 (1960); *Supler v. North Franklin Township School District*, 407 Pa. 657, 182 A. 2d 535 (1962); *Dillion v. York City School District*, 422 Pa. 103, 220 A. 2d 896 (1966); and *Husser v. Pittsburgh School District*, 425 Pa. 249, 228 A. 2d 910 (1967).

for that rule. Suffice it to say that the English origins trace to the position of the King in the feudal period and to the later identification of the King with the developing concept of sovereignty. The early bases for the rule of immunity have in more recent years given way to arguments of policy based on the belief that any governmental body, operating not for profit but for the public good, should not be financially liable for private injuries or subject to the difficulties which such liability would entail. Despite this shift in justification, the rule has long been subject to heavy and virtually unanimous attack by the commentators,[2] and, as the dissenting opinion of Justice ROBERTS points out, in recent years many courts across the country have abandoned or modified the rule of immunity as to some, or all, governmental units.[3]

The issue of immunity is, in its simplest terms, a question of the incidence of loss: stated baldly, should the accidental victim of a negligent act or omission imputable to a county be required to shoulder the full burden of the damages thus suffered, or should the burden of that loss more properly be shared by the citizens who are the constituency served by the governmental unit, and the beneficiaries of its existence and

---

[2] See Harper and James, *The Law of Torts* (1956), chap. 29; Prosser, *Torts*, 3rd ed. (1964), chap. 27 and sources cited therein at p. 996, ftnt. 3.

[3] See, e.g., *Hargrove v. Town of Cocoa Beach*, 96 So. 2d 130 (Fla. 1957); *Molitor v. Kaneland Community Unit District*, 18 Ill. 2d 11, 163 N.E. 2d 89 (1959), *cert. denied*, 362 U.S. 968 (1960); *Muskopf v. Corning Hospital District*, 55 Cal. 2d 211, 359 P. 2d 457 (1961); *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 115 N.W. 2d 618 (1962); *Spanel v. Mounds View School District*, 264 Minn. 279, 118 N.W. 2d 795 (1962); and *Myers v. Genessee County Auditor*, 375 Mich. 1, 133 N.W. 2d 190 (1965). But see *Clark v. Mobile County Hospital Board*, 275 Ala. 26, 151 So. 2d 750 (1963); and *Boyer v. Iowa High School Athletic Assn.*, 256 Ia. 337, 127 N.W. 2d 606 (1964).

of the function being performed when the alleged damage was inflicted? The law of torts has traditionally served to relieve the innocent victims of accidents of the burden of their losses, and recent developments in the law of torts and the fact of widespread insurance coverage have increasingly had the effect of distributing such losses more broadly through society, to those who benefit from a given activity or to those who choose to pool their own risks. The effect of the governmental immunity doctrine has been to remove from the normal operation of tort law a large area of accident-producing activity. As governmental bodies become larger, as they multiply with the population, as more services are demanded of them and they become more pervasive, their insulation from liability becomes more significant and more serious. In my view, neither the early conceptualistic theories nor the more recently articulated policy arguments are adequate to justify retention of the immunity doctrine in its present broad scope.[4]

## II.

A conclusion that the governmental immunity doctrine as now applied in this Commonwealth is an un-

---

[4] It should be noted that the abandonment of the rule of immunity as it is presently applied would not be an end to all immunities. "[N]o one today urges that a judicial remedy be given for all the injuries that may result from mistaken governmental action, or that the courts should decide when governmental action of a political nature is mistaken. The proper sphere of governmental immunity will remain a vital question even under systems which relax the indefensibly broad immunity which still prevails." Harper and James, *op. cit.* at pp. 1612-13. Indeed, most courts which have modified the immunity doctrine have adopted a rule of limitation similar to that of the Florida Supreme Court which stated that it would not impose liability for "the exercise of legislative or judicial, or quasi-legislative or quasi-judicial, functions." *Hargrove v. Town of Cocoa Beach, supra* (note 3) at p. 133.

satisfactory rule of law is not, however, the end of the matter, for there is the further important question as to whether, at the present time, change in the doctrine should properly come from the judiciary. Notwithstanding the defects, conceptual and practical, of governmental immunity, it has been argued, and it is the current official position of our Court, that abrogation or modification of the rule is a decision properly left to the legislature. *Dillon v. York City School District*, 422 Pa. 103, 220 A. 2d 896 (1966) and *Supler v. North Franklin Township School District*, 407 Pa. 657, 182 A. 2d 535 (1962). The proper relationship between legislative and judicial action in the on-going process of legal reform is an intriguing yet difficult subject, and the proper sphere of judicial initiative is likely to remain a vexing problem.[5] But in the case at hand, I believe that a consideration of that issue in some detail and a view of the experience in some of our sister states support the conclusion that the unsatisfactory doctrine now before us is a fit subject for abrogation by judicial action.

The courts have played the dominant role in the development of the common law. That role has encompassed not only the responsibility to preserve the stability of the law through the careful definition and application of precedents but also the responsibility to

[5] For recent analyses of this problem, see Keeton, "Judicial Law Reform — A Perspective on the Performance of Appellate Courts," 44 Texas Law Review 1254 (1966) ; Peck, "The Role of the Courts and the Legislatures in the Reform of Tort Law," 48 Minnesota Law Review 265 (1963) ; Keeton, "Creative Continuity in the Law of Torts," 75 Harvard Law Review 463 (1962) ; Green, "The Thrust of Tort Law, Part II, Judicial Law Making," 64 W. Virginia Law Review 115 (1962) ; and James, "Tort Law in Midstream : Its Challenge to the Judicial Process," 8 Buffalo Law Review 315 (1959). See, also, *Reimann v. Monmonth Consolidated Water Co.*, 9 N.J. 134, 140, 87 A. 2d 325, 328 (1952) (dissenting opinion of Chief Justice VANDERBILT).

insure the continuing viability of our common law through the re-examination, refinement, and adaptation of older doctrines in the light of changed circumstances or in response to sustained and meritorious criticism. Growth and flexibility no less than stability and predictability are essential to any living legal system, and the courts are equally charged with preserving both elements and with accommodating their occasionally competing demands.[6] While change in the law will most commonly proceed from an articulation of potentialities inherent in doctrines long accepted, growth must in some occasional instances take the more abrupt form of repudiation of a rule deemed to be unserviceable or unjust.

It should also be noted that a court which lends undue regard to an outmoded rule of law may by that same action threaten the stability and predictability of the law. Refusal frankly to abandon a rule of law which has not withstood critical scrutiny or which has been rendered anachronistic by the passage of time and events may itself breed uncertainty in the law, giving rise, from case to case, to casuistic distinctions which mitigate the rule's effect, but are impossible to apply with any consistency. The governmental-proprietary distinction developed by this and other courts

---

[6] "Existing rules and principles can give us our present location, our bearings, our latitude and longitude. The inn that shelters for the night is not the journey's end. The law, like the traveler, must be ready for the morrow. It must have a principle of growth." CARDOZO, *The Growth of the Law.*

"In truth, the common law, as a science, must be for ever in progress; . . . It is its true glory, that it is flexible, and constantly expanding with the exigencies of society; that it daily presents new motives for new and loftier efforts; that it holds out for ever an unapproached degree of excellence; that it moves onward in the path towards perfection, but never arrives at the ultimate point." STORY, *Inaugural Discourse as Dane Professor of Law* (August 25, 1829).

to curtail the harshness of the governmental immunity doctrine is an illustration. The delineation of a rational and consistent line between governmental and proprietary activities has eluded the courts and commentators,[7] and the line between such activities is likely to grow still more elusive as the government increasingly performs services only recently left to the private sector. Neither reason nor policy is well served by our attempt to retain the rule of immunity while grafting upon it inconsistent exceptions.

In short, I am convinced that the judiciary's traditional responsibility for adapting and improving the doctrines of the common law, particularly in the area of torts, coupled with its original role in the promulgation of the immunity rule, indicate that the judiciary is a natural and proper agent of change in the present case, unless there are countervailing considerations of such strength as to demonstrate the unwisdom of such a conclusion.

## III.

That such countervailing factors do exist and that any change in the rule of governmental immunity should therefore come from the legislature has been principally argued on two closely related grounds:

[7] "The attempt to determine whether liability exists when a state or municipal activity is conducted negligently by the test of whether it is a governmental or proprietary function has resulted in complete confusion." *Stouffer v. Morrison*, 400 Pa. 497, at 502-3, 162 A. 2d 378 (1960) (concurring opinion of Justice COHEN).

"But the classification of particular functions as governmental or proprietary has proved to be so confused and difficult, and has been the subject of so much disagreement, that little can be said about it here . . . It has been said that the 'rules which courts have sought to establish in solving this problem are as logical as those governing French irregular verbs.'" Prosser, *op. cit.* at p. 1005.

first, that the issue is one which falls peculiarly within the institutional competence of the legislature; and second, that judicial reform would upset the proper relationship between the judiciary and the legislature. We shall consider these two main grounds in order.

## A.

The proposition that modification of the rule of governmental immunity is a matter peculiarly within the legislature's competence appears to be based on three main premises: first, that legislative hearings or some other fact-finding process not available to the judiciary are a necessary condition of intelligent change; second, that the importance of governmental liability, especially in terms of cost, requires a comprehensive treatment which can be provided only by statute; and third, that the complexity of the issue of governmental liability requires the kind of detailed and pragmatic treatment which can only be supplied by the legislature.[8] While there is some merit in each of these positions, they are, when analyzed, unpersuasive.

As to the first premise, it has been said that the "courts could make a better appraisal of the comparative abilities of the judiciary and the legislature

---

[8] "[T]he solution of the problem of government responsibility in tort is too complex an undertaking to permit the partial and piecemeal judicial reform which the plaintiff seeks. Establishment of a comprehensive program by legislation applicable to the Commonwealth and to all of its subdivisions is sorely needed to deal effectively with tort claims arising out of the conduct of governmental activities." *Morris v. Mt. Lebanon Township School District, supra* at pp. 635-36.

"Only the legislature can deal with the field of immunity in all of its state, municipal corporations and school district aspects by enacting a comprehensive bill based on extensive hearings and investigation." *Dillon v. York City School District, supra* at p. 106.

to deal with a particular problem if consideration were given, on a selective basis, to the probabilities that relevant empirical data would be available to legislative committees but not to the judiciary."[9] While consideration of some problems of tort law would be greatly enriched by the use of relevant empirical data, I doubt that problems of immunities fall into this category. The principal factual issues of concern are the number and the potential cost of actions which might be brought against counties should immunity be abrogated and the effect which the threat of such liability would have in inducing counties to institute safety programs or to alert their employees to the need for a higher standard of care. Obviously, there are no local statistics as to either of these matters. Any studies of the effect of abandoning the immunity in other jurisdictions are surely available to the courts as well as to the legislature, either through their own research or through the efforts of adversary counsel or amicus curiae who may be called upon to explore specific issues. I am satisfied that in a case of this sort the possibility that useful data unavailable to courts might be brought to bear on the issue at hand through the legislative process is not a matter of great significance. Moreover, factual data alone do not determine the soundness of a given rule of law. Equally relevant are the history and theory of the challenged rule and the logical or probable consequences of any modification of or departure from it. These matters are peculiarly within the scope of a court's expertise, and the relevant source materials—the reported decisions of all jurisdictions and the critical literature—are the stuff of judicial research and deliberation.

[9] Peck, *op. cit.* at p. 279. See, also, COHEN, "Hearing on a Bill: Legislative Folklore?" 37 Minnesota Law Review 34 (1952) ; and COHEN, "Towards Realism in Legisprudence," 59 Yale Law Journal 886 (1950).

Secondly, it is argued that a comprehensive reform of the rule of immunity may only be accomplished by the legislature, but that position, without more, is not an argument against partial judicial reform. That only a comprehensive statutory enactment can set forth the full extent of liability to be imposed on each type of governmental unit does not entail as a necessary or logical corollary the further position that partial reforms must be avoided; that conclusion requires a second premise that case-by-case reforms are objectionable on some other grounds. Moreover, while any judicial decision is by nature limited by the facts of the case presented for decision, such limitation is not without its benefits, for it enables a court to "make haste slowly," assessing and evaluating both its rationale and the effect of its decision in the light of unfolding experience.

Finally, it has been said that the statute, unlike the judicial opinion, is a flexible tool of public policy and that the complexity of the issue of governmental liability renders it the preferable means of reform. This position, in my view, understates the considerable abilities of the courts to fashion specific rules and remedies taking into consideration the distinctions between one case and another. It also overlooks the flexibility inherent in decisional techniques such as prospective overruling, which the Court might employ in a case of this sort.[10] It is necessary to acknowledge, however,

---

[10] Some of our sister states in abandoning the rule of immunity have resorted to prospective overruling to mitigate whatever problems of reliance would arise from a break with its decisional past or to enable the legislature to speak its will before any new rule would be given effect. See *Molitor v. Kaneland Community Unit District, supra* at nt. 3; *Spanel v. Mounds View School District, supra* at nt. 3 (new rule not applied to case at bar and made effective as of the end of the next legislative session); and *Holytz v. City of Milwaukee, supra* at nt. 3 (rule applicable to case at bar and to all torts occurring after July 15, 1962; decision an-

the legislature's greater freedom in developing pragmatic, *ad hoc* solutions to the problems which governmental liability might entail. The legislature might, if it so chose, establish special provisions for the filing of notice, restrict the ordinary statute of limitations, or limit the recovery which could be had against a given governmental unit to a specified dollar limit; it might also mandate nonjury trials in all actions against a municipality, establish detailed procedures for negotiations and settlement, or provide for an administrative determination of the fact and degree of liability. Notwithstanding the considerable flexibility open to the judiciary, none of these remedies lie properly within its powers.

Nevertheless, granting the greater pragmatic resources available to the legislature, one need not conclude that reform can come only from that body. The statute and the opinion are not incompatible tools of public policy; one need not categorize any given problem as susceptible to legislative (or to judicial) rule-making alone. Rather the courts and the General Assembly are more fruitfully seen as joint participants in the governmental process, the efforts of each body being complementary to, and necessary for, the proper functioning of the other. The legislature must perforce rely on the judiciary to interpret faithfully the apparent intent of its statutes, to define ambiguous statutory terms, and to fill the interstices of legislative provisions. Equally, the judiciary should have no fear of legislative enactments which supplement, implement, or modify its pronouncements.

I conclude that the above arguments as to the superior competence of the legislature do not preclude

---

nounced June 5, 1962). I point to this device not to advocate it but to illustrate that there can be more flexibility to court decision than is commonly supposed.

judicial action in the case now before us; as will be noted, such action seems fully warranted and in keeping with the proper relationship between the legislature and the courts.

## B.

Questions of institutional competence aside, it may be argued that judicial modification of the rule of immunity would upset the proper relationship between the legislature and the judiciary in two respects. First, the legislature's inactivity or acquiescense in the face of this Court's continuing application of the governmental immunity doctrine might be deemed to constitute a tacit adoption of that policy. As to that, "Professor Hart has pointed out [that] the Constitution of the United States and each of the state constitutions prescribe the ways in which bills shall become law, and failing to enact a bill is not one of them."[11] Indeed, in view of the courts' traditional role as the guardian of the common law, the legislature might be forgiven for assuming that change, if it is warranted, will come from the judiciary, and that an unjust rule will be corrected by its author.[12]

[11] Peck, *op. cit.* at p. 291, adverting to Hart, "Comment on Courts and Law in the Making," printed in *Legal Institutions Today and Tomorrow*, 40, 46 (1959).

[12] Such an argument has been employed in at least one state to counter proposals for legislative reform of a common law doctrine first promulgated by the courts. *Williams v. City of Detroit*, 364 Mich. 231, at 273, ftnt. 5, 111 N.W. 2d 1 (1961) (concurring opinion of Justice BLACK).

"The day will come when this Court can no longer escape answering the question as to whether school districts are liable in tort under circumstances such as those announced in this litigation. It is a vain hope that some other branch of the government will accept the task which is strictly that of the judiciary. Indeed, I would say it is an improper hope to indulge in, that the Legisla-

Other reasons than acceptance may be readily found for the legislature's failure to act in this area. The relative lack of time available to legislators, the pressing demands made upon them by their constituents or other organized groups, the urgency of the many issues of public law which require resolution, and the inadequate staff and resource personnel available to assist them are all factors which militate against legislative consideration of issues of tort law. "Only the most compelling needs are likely to capture its [the legislature's] attention. In these circumstances, the aphorism that a legislature's failure to enact a change is an expression of approval of the law as it stands is a patent fallacy."[13] The prospects for legislative action in the area of tort law are further diminished by the fact that the persons aggrieved by the operation of the immunity rule, i.e., the scattered victims of governmental negligence, are not a coherent or identifiable group so situated that they might mobilize themselves and make their collective voice heard in the legislature. In all probability, remedial legislation providing redress for victims of governmental torts would not be retroactive so as to compensate for past losses; hence there is little incentive on their part to press for such legislation.

I find no realistic support for the conclusion that governmental immunity is the policy of the legislature; there having been no specific expression by the legislature on the issue, judicial abolition of the rule of immunity would not conflict with any express legislative policy.

Secondly, however, it might be argued that it is an exercise of judicial statesmanship for this Court

---

ture will take over a responsibility which resides in the courts." *Dillon v. York City School District, supra,* p. 108 (dissenting opinion of Justice MUSMANNO).

[13] Keeton, "Judicial Law Reform . . .", *op. cit.* at p. 1262.

to refuse to abrogate a long-settled doctrine, since judicial action might precipitate legislative counter-action. Such a position takes as an evil—the interplay of decisions by the courts and the legislature—what is in fact the natural state of things. Moreover, the experience of other states indicates that judicial initiative in reforming certain tort doctrines may serve as an impetus to legislative consideration of the subject matter. In California and Illinois, for example, judicial decisions modifying or abrogating governmental immunity have induced legislative responses which have set conditions upon recovery and given statutory form to the new liability.[14] In each case, the end product of the chain of judicial decision and legislative enactment has been a rule of liability more restrictive than would have resulted from the court decision, but less restrictive than that which existed prior to the relevant decision. The situation in those states has been summarized by Professor Keeton as follows: "In choosing the best among the possible rules open to them without transgression of limits of judicial function, these courts moved further toward rejection of immunities than could be sustained against views whose force could be brought to bear in the legislative arena. But in so doing they overcame legislative inertia, a potent force that otherwise would have delayed or defeated attempts at reform. Thus these developments may be viewed as illustrating not merely the possibility of clash between decisional and statutory creativity but also the possibility of their serving in combination to bring about reform that neither alone would have been likely to achieve."[15]

[14] See Cal. Stats. 1963, c. 1681, p. 3267, §1 et seq., West's Ann. Gov. Codes §810 et seq.; and Local Government and Governmental Employees Tort Immunity Act, Act of August 13, 1965, Laws 1965, p. 2983, §1 et seq., 85 Ill. Stat. Ann. §1 et seq. (Smith-Hurd 1966).

[15] Keeton, "Creative Continuity . . .", op. cit. at p. 475.

That the General Assembly can, and may, pass upon a subject does not preclude this Court from acting to curtail a rule whose rationale and effects no longer commend themselves to us. Similarly our assumption of certain initiatives in the reform of the common law does not free us from our obligation to implement the apparent intent of the legislature should it choose to speak on the same subject.

In conclusion, I am unable to believe that the governmental immunity doctrine in its present expansive application warrants continued support, and I believe that reform of that doctrine in the first instance may properly begin with this Court. Accordingly, I must respectfully dissent from the view of the majority.