# Biello, Appellant, *v.* Pennsylvania Liquor Control Board.

Argued January 18, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and NIX, JJ.

reargument refused January 7, 1974.

*William J. Brickley,* with him *Yale B. Bernstein,* and *Brickley, Torpey & Bernstein,* for appellant.

*Alexander J. Jaffurs,* Assistant Attorney General, with him *J. Leonard Langan,* and *Thomas J. Shannon,* Assistant Attorney Generals, and *J. Shane Creamer,* Attorney General, for Pennsylvania Liquor Control Board, appellee.

OPINION BY MR. JUSTICE O'BRIEN, March 16, 1973:

Appellant instituted this action for wrongful death and survival in the Court of Common Pleas, Dauphin County, and named as defendants: The Pennsylvania Liquor Control Board, the individual members of the Board, the Director of State Stores, and the manager of a specific State Store.

Appellant alleged that the decedent, a sixteen-year-old boy, purchased a bottle of Scotch whiskey from a State Store. The boy consumed part of the bottle, became drunk, and, as a result of his intoxicated condition, fell eleven floors from a fire escape to his death.

The Attorney General filed preliminary objections, averring that the Pennsylvania Liquor Control Board is an instrumentality and agency of the Commonwealth; that an action against the Board is an action against the Commonwealth; that the Commonwealth cannot be sued without its consent; and that there has been no such consent in this case. Appellant answered these preliminary objections.

The proceeding was transferred subsequently to the Commonwealth Court of Pennsylvania, where the At-

torney General's preliminary objections were sustained, with two judges dissenting, *Biello v. Pa. Liquor Control Bd.*, 1 Pa. Commonwealth Ct. 179 (1971), and the complaint was dismissed; this appeal followed.

This case raises the question of the immunity of an agency of the state from actions in tort.

The doctrine of sovereign immunity arrived in Pennsylvania in *Respublica v. Sparhawk,* 1 Dallas 357 (1788). That case was a suit to recover the value of flour relocated by the Pennsylvania War Board pursuant to a legislative directive to prevent British capture of supplies should they occupy Philadelphia.

The plaintiff in *Sparhawk* did not contend "that, generally speaking, citizens may sue the State; but only that every Government, which is not absolutely despotic, has provided some means (in England, for instance, by petition in Chancery) to obtain a redress of injuries from the sovereign." 1 Dallas at 361.

Chief Justice M'KEAN responded by affirming the legislature's right to order relocation of private belongings when the necessity of war demands. He was not impressed with the plaintiff's plea that the loss be spread. "It is a rule, however, that it is better to suffer a private mischief, than a public inconvenience; and the rights of necessity form a part of our law." 1 Dallas at 362.

*Sparhawk* was extended in *John Black v. Rempublicam,* 1 Yeates 140 (1792), a case in which Pennsylvania galley captains had seized private provisions while fleeing from the British across the Delaware River. The captains used the provisions to feed their own troops and promised the landowner compensation. The court held that since the captains had no authority to contract, there could be no recovery in contract, and, further that *Sparhawk* precluded recovery in tort.

Were sovereign immunity a creature of pure common law, we might be disposed to a consideration of the

abrogation of that much criticized doctrine.[1] However, Article I, Section 11 of the Pennsylvania Constitution provides, *inter alia*: "Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct." This language consistently has been interpreted to mean that no suit may be maintained against the state in tort until the legislature specifically has provided for such an action. *Meagher v. Commonwealth,* 439 Pa. 532, 266 A. 2d 684 (1970); *Bannard v. N.Y.S. Nat. Gas Corp.,* 404 Pa. 269, 172 A. 2d 306 (1961); *Brewer v. Commonwealth,* 345 Pa. 144, 27 A. 2d 53 (1942); *Bell Telephone Co. v. Lewis,* 313 Pa. 374, 169 A. 571 (1934); *Collins v. Commonwealth,* 262 Pa. 572, 106 A. 229 (1919); *Fitler v. Commonwealth,* 31 Pa. 406 (1858). Pennsylvania is thus consistent with the majority of the states of this nation who have refused to treat similar constitutional provisions as being self-executing.[2] The rationale seems to have been that such a constitutional provision must be strictly construed since it is in derogation of the states' inherent exemption from suit.

The question of whether a particular action is one against the Commonwealth is not to be determined

---

[1] For a comprehensive list of states that have judicially abrogated sovereign and/or governmental immunity, see the dissents of Mr. Justice ROBERTS in *Smeltz v. Harrisburg,* 440 Pa. 224, 269 A. 2d 466 (1970), and *Thomas v. Baird,* 433 Pa. 482, 252 A. 2d 653 (1969).

For criticism of the injustice wrought by the doctrine, see the dissents of Mr. Justice ROBERTS in *Flinchbaugh v. Cornwall-Leb. Sch. Dist.,* 438 Pa. 407, 264 A. 2d 708 (1970), and *Laughner v. Allegheny County,* 436 Pa. 572, 261 A. 2d 607 (1970), and the dissent of Mr. Justice MUSMANNO in *Rader v. Pa. Turnpike Commission,* 407 Pa. 609, 182 A. 2d 199 (1962).

[2] See 81 C.J.S., States, §215, page 1304. For a complete list of jurisdictions so holding, see *Krause v. State,* 31 Ohio St. 2d 132, 141, 285 N.E. 2d 736 (1972), and *Raudabaugh v. State,* 96 Ohio St. 513, 118 N.E. 102 (1917).

solely by reference to the nominal parties to the record. *Rader v. Pa. Turnpike Commission,* 407 Pa. 609, 182 A. 2d 199 (1962); *Merchants' Co. v. Gelder,* 349 Pa. 1, 36 A. 2d 444 (1944); *Bell Telephone Co. v. Lewis,* supra.

In *Rader,* this Court held: "that the Pennsylvania Turnpike Commission [is] an instrumentality of the Commonwealth *engaged in a governmental function* and therefore is not liable for . . . injuries and damages in a trespass action." At page 611. (Emphasis in original.) We subsequently approved of immunity for agencies engaged in governmental function in *Thomas v. Baird,* 433 Pa. 482, 252 A. 2d 653 (1969) (Turnpike Authority); *Roney v. General State Authority,* 413 Pa. 218, 196 A. 2d 349 (1964) (General State Authority); and in *Anderson Appeal,* 408 Pa. 179, 182 A. 2d 514 (1962) (Delaware River Port Authority).

While in Pennsylvania we have not before expressly employed the distinction between governmental and proprietary functions when considering the sovereign immunity doctrine, it has nonetheless been implicitly present in our application of the doctrine. In many of our decisions where we have found the bar to exist, we have noted that the function being performed was a governmental one. *Roney v. General State Authority, supra; Anderson Appeal, supra; Rader v. Pa. Turnpike Commission, supra,* and *Merchants' Co. v. Gelder, supra.*

In accepting the distinction between governmental and proprietary functions, we are appreciative of the difficulties experienced by our courts using this distinction in the context of the governmental immunity cases and are mindful of the warning of Mr. Justice COHEN that "perhaps there is no issue known to the law which is surrounded by more confusion." *Morris v. Mt. Lebanon Twp. Sch. Dist.,* 393 Pa. 633, 637, 144 A. 2d 737 (1958). See also Mr. Justice MUSMANNO's dissent

in *Boorse v. Springfield Twp.,* 377 Pa. 109, 103 A. 2d 708 (1954).

The sole issue remaining is whether the Liquor Control Board was acting in a governmental or proprietary capacity when it sold young Joseph Biello a bottle of whiskey. In *Merchants' Co. v. Gelder, supra,* a case where a warehouseman sought contractual relief against the Liquor Control Board for liquor storage, we held that the State could prescribe the manner and procedure to be used in such suits because the Board enjoyed the State's immunity. In *Gelder,* the court reasoned that the Board, while storing whiskey as a wholesaler, was performing an essentially governmental function under the exhaustive set of regulations set forth in our Liquor Code. Act of April 12, 1951, P. L. 90, Art. I, §101 et seq., 47 P.S. §1-101 et seq. We are unable to distinguish *Gelder* from the instant case. The retail sale of liquor herein engaged in by the board is as much a part of the Commonwealth's comprehensive scheme to regulate the sale and consumption of alcohol as is storing the alcohol for distribution to the state stores, the activity in question in *Gelder.*

We do not believe, as appellant contends, that the Commonwealth is in the liquor business solely in order to raise revenue. If revenue were, in fact, the real purpose for the Liquor Control Board's activities, it would not need to operate all retail outlets. Instead, a tax in the nature of a sales tax could have been enacted to raise all necessary revenue without the concommitant regulation.

Appellant also argues that by enacting §493(1) of the Liquor Code [47 P.S. §4-493(1)], the Legislature has, in the language of Article I, Section 11 of the Pennsylvania Constitution, "directed" that the Commonwealth may be sued in cases such as this. Section 493(1) of the Liquor Code provides: "It shall be unlawful . . . [f]or . . . the board, or any employe, servant

or agent of . . . the board . . . to sell . . . any liquor . . . to any minor. . . ."

According to appellant's argument, the only possible explanation for the Legislature's having made it unlawful for the Board to sell liquor to minors was to indicate that the Board could be held civilly liable for the consequences of such sales, since no criminal sanctions are imposed. However, Article I, Section 11 of the Pennsylvania Constitution indicates that if the Commonwealth is to be liable to suit, the Legislature must direct the "manner and courts" in which such suits may be brought, as well as the types of cases in which suit is permitted. We do not believe that the enactment of §493(1) of the Liquor Code is the type of "direction" which the Constitution requires.

Consequently, because we believe that this case is controlled by *Gelder*, Article I, Section 11 of the Pennsylvania Constitution requires that we affirm. Were this a case of first impression, we might interpret the language otherwise. However, the interpretation given by our courts is steeped in historical precedent apparently concurred in by the Legislature and the people of Pennsylvania, in that no effort has been made over the years to change the provision. We, therefore, believe that the meaning of this provision, interpreted as it has been for so long and so consistently, can now only be appropriately changed by legislative action.[3]

Judgment affirmed.

Mr. Justice MANDERINO took no part in the consideration or decision of this case.

Mr. Justice EAGEN and Mr. Justice POMEROY concur in the result.

---

[3] The obvious legislative solution, chosen by such states as New York, Oklahoma, Oregon, Nevada, California and Illinois, is a comprehensive tort claims statute. In the past, appeals to our Legislature to follow their example have invariably fallen upon deaf ears. See, e.g., *Supler v. N. Franklin Twp. Sch. Dist.*, 407 Pa.

DISSENTING OPINION BY MR. JUSTICE NIX:

I respectfully dissent.

Again, the majority of this court has refused to accept its responsibility and strike down an anachronism in the law of Pennsylvania known as sovereign immunity. Although this court and many others throughout this nation have on numerous occasions recognized the doctrine as an obsolete vestige of a distant past, a majority of this court persists in its refusal to remedy the injustices occasioned by the doctrine offering only the weak protestation that the court does not possess the power to abolish this doctrine. This conclusion is premised upon the belief that the genesis of sovereign immunity is not common law but rather that it is mandated by the Constitution of this State. Both the history of this doctrine and the clear language of the Constitution of this State refute this premise.

Sovereign immunity, in this country, is a derivative of the English feudal system. Under that system the lord of the manor provided courts to resolve disputes arising within the fiefdom and, concomitant with his absolute authority, the lord was deemed to be immune from suit in his court.[1] As the English system developed to a monarchy, the king assumed the powers of the feudal lords and among these powers and prerogatives was his immunity from suit. This thirteenth century version of sovereign immunity existed as the monarch's personal prerogative.[2]

---

657, 660, 182 A. 2d 535 (1962) ; *Stouffer v. Morrison*, 400 Pa. 497, 162 A. 2d 378 (1960) ; *Morris v. Mt. Lebanon Twp. Sch. Dist.*, 393 Pa. 633, 635, 144 A. 2d 737 (1958). We can only hope that they will now see the wisdom of such action.

[1] Pollock & Maitland, The History of English Law, 518 (1899 ed.)

[2] While there is some authority that the doctrine was partially based on the maxim, "The king can do no wrong", (See Blackstone's Commentaries on the Law, Gavits' Ed., at 111) there is evidence

By the sixteenth century, the king's powers were conceptualized as the State, and his prerogative not to be sued became sovereign immunity for the State.[3] That immunity could be circumvented in two ways: The king, upon petition, could consent to suit; or The Court of Exchequer could use its King's Bench power to grant relief against the crown. "[I]t would derogate from the King's honour to imagine that what is equity against a common person should not be equity against him."[4] Thus, only rarely did the English version of sovereign immunity operate as a complete bar to a plaintiff's recovery.[5]

From this history it is evident that the concept of State's immunity from suit was a firmly established doctrine of the English common law long before this Commonwealth of Pennsylvania had been conceived. Further, I believe that the language of the Constitution itself fails to provide any basis for the majority's assumption that in Pennsylvania this immunity is constitutionally mandated. Neither within the present Constitution of this Commonwealth nor any of its predecessors can there be found an expressed grant of immunity from suit. To the contrary, Article I, Section 11 merely sets forth the mechanism by which the State may waive

---

that the maxim originally meant that the king was not privileged to do wrong. Borchard, "Government Liability in Tort", 34 Yale L.J. 1, 2 (1924) ; Ehrlich, *Proceedings Against the Crown 1216-1377*, at p. 42.

[3] Watkins, "The State As a Party Litigant", 12 John Hopkins University Studies In Historical and Political Science Series XLV No. 1, at 11 (1927).

[4] Per Atkyns, B., *Pawlett v. The Attorney-General* (1668), Hadres 465, 469; 145 Eng. Rep. 550, 552. *Dyson v. The Attorney-General* (1911) 1 K.B. 410, 415.

[5] *Muskopf v. Corning Hospital District*, 55 Cal. 2d 211, 212, 359 P. 2d 457, 458 (1961). Interestingly enough, sovereign immunity in the United States developed as an absolute bar and no suit could be brought without expressed waiver of the State. See *Borchard*, supra, note 2, at 4.

this power.[6] It provides that: "Suits may be brought against the Commonwealth in such manner in such courts and in such cases as the legislature may by law direct." The Constitution is therefore neutral—it neither requires nor prohibits sovereign immunity. It merely provides that the presence or absence of sovereign immunity shall be decided in a non-constitutional manner. The framers of the Constitution accepted the then prevalent concept of sovereignty to include immunity from suit, and attempted through this section to implement the power of the State to consent to actions brought against it.

This portion of the Constitution was also directed to resolving the issues of whether there was, in fact, the power to consent to suit and if that power was found to exist, which branch of the government had the power to exercise that judgment. *The majority mistakenly concludes that since the framers recognized the need for the resolution of these issues they thereby mandated the doctrine itself. In my judgment it is an unwarranted conclusion to assume from the grant of the power of consent to the legislative branch that this was implicitly an abrogation of the court's traditional powers to abolish common law principles when they no longer meet the needs of the time.*

Construing a similar provision in their State Constitution the Supreme Court of Indiana in the case of *Perkins v. State*, 252 Ind. 549, 551, 251 N.E. 2d 30, 32 (1969) noted: "We are dealing here not with a constitutional prohibition, but rather with a principle of common law which has its roots in the ancient common law of England. . . ." See, also *State v. Turner*, 286 N.E. 2d 697 ( Ind. 1972).

---

[6] The language before us in Article I, Section 11 of our present Constitution is identical to the language used in the original Constitution.

This being a principle of common law rather than a constitutional prohibition, it cannot be questioned that the courts have the power to alter that principle when that principle is no longer consistent with the needs of our present society. "The rules and principles of case law have never been treated as final truths, but as working hypotheses, continually retested in those great laboratories of the law, the courts of justice. Every new case is an experiment; and if the accepted rule which seems applicable yields a result which is felt to be unjust, the rule is reconsidered. It may not be modified at once, for an attempt to do absolute justice in every single case would make the development and maintenance of general rules impossible, but if a rule continues to work injustice; it will eventually be reformulated." CARDOZO, J., The Nature of the Judicial Process, 121 (1921). It must be concluded that the time is long overdue when this principle should be reassessed.

Having concluded that this court has the power to abrogate sovereign immunity, I would also conclude that it should do so in this case. By the end of the eighteenth century, the States of this union had accumulated debts resulting from the War of Independence. Most chose to invoke the doctrine of sovereign immunity in order to avoid financial disaster.[7] The decision in *Black et al. v. Rempublicam*, 1 Yeates 139 (1792), was at least partially motivated by such considerations. See, 1 Yeates at 141.

The fact that sovereign immunity may have possessed a viable rationale at the end of the eighteenth century does not foreclose a reconsideration of that

---

[7] For a discussion of the furor caused by the United States Supreme Court's decision in *Chisholm v. Georgia*, 2 U.S. 419 (1793) permitting a Georgia resident to circumvent South Carolina's sovereign immunity doctrine by suing in a Federal Court, See Currie, *Federal Courts*, 445 (1968).

rationale in view of our present day society. "If the judges have woefully misinterpreted the mores of their day, or if the mores of their day are no longer those of ours, they ought not to tie in helpless submission, the hands of their successors." CARDOZO, J. The Nature of the Judicial Process, 121 (1921).

Whatever validity sovereign immunity may have had in the eighteenth century has disappeared. Modern state governments employ multi-billion dollar budgets to undertake functions which would have been inconceivable under the laissez faire philosophy of earlier years. There is absolutely no reason why a state should not insure itself from tort liability (unless it prefers to be self-insured) just as every private enterprise must.[8] The injustice of the doctrine of sovereign immunity is underscored in a case such as the one at bar. Here, the State has entered into the business of selling liquor, and in so doing, it reaps millions in profits.[9] Still, the majority invokes the doctrine of sovereign immunity—a doctrine whose only possible rationale was to protect faltering colonial treasuries—to shield these profits from tort liability.

The overwhelming majority of commentators also conclude that sovereign immunity for tort liability has outlived its usefulness. See, e.g., Prosser on Torts, 3d Ed., p. 1010; Harper, The Law of Torts (1933); McGuire, "State Liability For Tort", 30 Harv. L. Rev. 20 (1916); Borchard, supra; Leflar and Kantrowitz, "Tort Liability of the States," 29 N.Y.U.L. Rev. 1363 (1954). Several of our sister states have judicially abrogated the doctrine of sovereign immunity. See, e.g., *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P. 2d

---

[8] See, Green, "Freedom of Litigation", 38 Ill. L. Rev. 355, 379-383 (1944).

[9] In the fiscal year ending June 29, 1971, the L.C.B. realized a net profit of $149,964,222.25 including taxes.

107 (1963); *Muskopf v. California Hospital District,* 55 Cal. 2d 211, 359 P. 2d 457 (1961); *Smith v. State,* 93 Idaho 795, 473 P. 2d 937 (1970); *State v. Turner,* 286 N.E. 2d 697 (Ind. 1972); *Williams v. City of Detroit,* 364 Mich. 231, 111 N.W. 2d 1 (1961) (dictum); *Willis v. Department of Conservation and Economic Development,* 55 N.J. 534, 264 A. 2d 34 (1970).[10]

I recognize that a decision abrogating sovereign immunity would depart from previous doctrine of this court. However, in urging such a departure, I am comforted by the words of Oliver Wendell Holmes: "It is revolting to have no better reason for a rule of law than it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule persists from blind imitation of the past." (Collected Legal Papers of Oliver Wendell Holmes, 187.)

The enormity of the inconsistency of the position of the majority is best appreciated by an appraisal of the result that obtains under their holding. Having determined that the regulation of the sale of alcoholic beverages is an appropriate governmental function and that a monopolistic control of retail sales is a permissible means for discharging that responsibility they then sanctioned the use of the State's immunity to preclude redress for an apparently clear tortious performance of that obligation.

I am completely at a loss to find any justification for allowing such an unjust result and I therefore dissent.

Mr. Justice ROBERTS joins in this dissenting opinion.

---

[10] A great many more states have judicially abrogated the doctrine of immunity for local governments, believing that that immunity also lacks a rational basis. See the dissents of Justice ROBERTS in *Thomas v. Baird,* 433 Pa. 482, 252 A. 2d 653 (1969), and in *Smeltz v. Harrisburg,* 440 Pa. 224, 269 A. 2d 466 (1970).