## Romisher v. SEPTA

*Nelson Romisher*, for plaintiffs.
*Henry A. Stein*, for defendant.

BARBIERI, J., March 19, 1974.—This negligence case is before this court en banc, composed of DiNubile and Barbieri, JJ., on "Defendant's Exceptions to Adjudication and Order of June 26, 1972." The order in question was entered by the late Hon. Joseph Sloane after a trial before him on June 22, 1972, without a jury. A new trial will be ordered.

The minor plaintiff, Marc Romisher, a high school student at age 16, was injured at 3:30 p.m. on December 12, 1969, in a scuffle with one or more other students on the train platform of a Philadelphia subway station of the Southeastern Pennsylvania Transportation Authority (SEPTA). He was at the Olney Station on the northbound side, destination Fern Rock, and he had paid his fare. The Philadelphia police had manned the station, but minor plaintiff's testimony was that the one policeman he saw there was not on the train platform, but was on an upper level.

Defendant offered no evidence, and the sole account of the event was given by minor plaintiff. He stated that he was waiting for a northbound train on the lower or train level with only himself and a "couple other students." When the train arrived, he was pushed by students who were exiting from the cars, and his injuries took place in a scuffle that followed. At one point, he stated:

"Q  What did you do when they pushed you?

"A  I, you know, pushed away, tried to defend myself.

"Q  And what happened after that?

"A  I really don't remember. I just—one of them pulled out a chain and struck me with the chain. And the others started coming, you know, hitting me."

However, on cross-examination his testimony indicates that there was no competent evidence of a "chain" attack, but there was actually merely a schoolboy scuffle. He testified that he was pushed and then as follows:

"Q  They just pushed you out of the way?

"A  Right.

"Q  They pushed—

"A  Yes.

"Q  They just pushed you?

"A  Yes.

"Q  Did they hit you with anything at that point?

"A  They started crowding around, you know, and I started getting pushed from—you know, pushed all around.

"Q  Well, your testimony · was, 'a couple of them pushed me.'

"A.  Yes.

"Q  Was that while they were streaming out of the car and toward the steps?

"A  No. I was off to the side. They went out of their way to push me.

"Q  But they didn't strike you with anything at that point?

"A  No. I really couldn't say.

"Q  Well, you didn't see any chain at that point, did you?

"A  No, no. . . .

"Q  And then, you say, you pushed back to defend yourself?

"A Right.

"Q Did you swing at anybody?

"A Not until I was swung at.

"Q Well, let's get this right. They came out of the subway car, you say, and a couple of them pushed you; right?

"A Right.

"Q Is a couple one, two, or three?

"A The whole car was just streaming out.

"Q Yes. But how many pushed you? It wasn't the whole car.

"A I really couldn't say.

"Q A couple?

"A A couple, right.

"Q And then you pushed back?

"A Right.

"Q And then what happened?

"A And then I just—one of them started swinging.

"Q Did he land any punches?

"A Yes.

"Q And where did he land the punches?

"A On my head.

"Q And then you started to swing back?

"A I remember swinging once, yes.

"Q And then a fight erupted?

"A That's all I remember.

"Q So you don't remember being hit by a chain?

"A No."

The minor plaintiff testified that there had been shoving, hitting and fights before; that the pushing which started the scuffle had occurred without any indication that it would happen; that "we complained to the school, you know, to get more protection," but when asked if he ever complained to SEPTA, he answered: "I really don't know." His father, Harry

Romisher, testified over hearsay objection that he had heard a neighbor whose son also attended minor plaintiff's school make a telephone call to complain to SEPTA that his son had been "attacked with an umbrella on the same subway platform at Broad and Olney a short period of time before my son was attacked."

The trial court made the following findings:

"1. Defendant was the one negligent which caused minor Plaintiff's injuries.

"2. Plaintiffs proved by the fair weight or preponderance of the evidence their right to recover proper damages from Defendant."

Preceding these findings in the body of the trial judge's "Adjudication" there is noted that minor plaintiff, "while in the subway station at Broad Street and Olney Avenue, ready to board a subway train, was, without reason or provocation or incitement attacked and assaulted and injured, by one or more other alighting passengers."

Out of the arguments and well briefed issues there emerges one really central question: who has the duty, if the occasion demands, to furnish police protection on a subway platform of SEPTA in Philadelphia? We are not at all satisfied that actionable negligence on the part of anyone is established in this case, quite aside from such questions as proximate cause and what may be the duty to protect a passenger from criminal assault. See Pearlstein v. Philadelphia Transportation Company, 400 Pa. 365 (1960). It is true that a common carrier has a very high duty of care owed by it to a passenger. Such duty may be in a lesser degree as to a platform incident as compared with an injury inside of a car. In any event, it must be conceded that whatever the common carrier's duty is, it would

extend in some degree to a platform under its control, although the platform in question may be owned by the city.

But the parties herein have argued a criminal conduct issue, so that we may not be concerned here with only a matter of ordinary lack of care. Here, the parties have raised the alleged obligation, if foreseeable, to protect a passenger from a criminal attack. Parenthetically, youthful scuffles are predictable but, generally, it is not possible to guard against them on a preventive basis, and mere unruliness on the part of a passenger, especially if without warning, is not ordinarily actionable. This case is an example on point. Apparently everyone, including the minor plaintiff, could have anticipated a shoving and fist-throwing incident between teen age boys such as happened in this case. But when such an incident is likely to occur may be totally unpredictable. See Widener v. Philadelphia Rapid Transit Company, 224 Pa. 171 (1909). Perhaps it would not have happened if a policeman were on duty on the lower level rather than on the upper one. Conceding this, however, the question is: how can liability be imposed upon SEPTA for this lack of police protection?

It is urged that SEPTA must provide its own guards for protection against criminal conduct or, at least, prove that it has demanded more adequate police protection from the city. Our courts have never declared that such a responsibility is imposed upon public passenger carriers. There is a duty, of course, to provide protection against expectable violent but noncriminal conduct, such as a rush of people at a park or place of amusement: Coyle v. Philadelphia & Reading Railway Company, 256 Pa. 496 (1917).

In Coyle, the following general rule is stated at page 499:

"Defendant company had no employee at the station to control or warn the large number of persons it knew would assemble there to take the train. In Muhlhause v. Monongahela St. Ry. Co., 201 Pa. 237, this court held it to be the duty of the carrier to furnish a safe and sufficient means of ingress to, and egress from, its trains, and to exercise 'the strictest vigilance' in protecting intending passengers, assembled at its stations, from liability to injury. Although a carrier is not liable for mere rudeness and bad manners on the part of their passengers, or intending passengers, and, therefore, not bound to anticipate and guard against such conduct, yet *when it invites the public to use its facilities to visit parks, or places of amusement, it has notice that large crowds are likely to assemble,* and that proper care must be used in protecting them from injuries arising from such conduct as may reasonably be expected to occur, such as a sudden rush on the part of the crowd to obtain entrance to cars immediately upon arrival of trains at the station. Such acts on the part of a large assemblage of people, congregated for the common purpose of securing passage on a public conveyance, are not within the reasoning of the line of cases which hold the carrier is relieved from liability for damages resulting from unexpected acts of rudeness or improper conduct on the part of other passengers, or intending passengers, but are such as occur so frequently that they may be properly considered as such a natural and probable result that the carrier must recognize and guard against them." (Italics supplied.)

Plaintiff urges that we adopt as authority for his position the decisions in certain New York cases, citing Amoruso v. N. Y. City Transit Authority, 12 App. Div. 2d 11, 207 N. Y. Supp. 2d 855 (1960). Amoruso involved merely a remand and was decided by a

divided court, both sides relying upon Langer v. City of New York, 9 Misc. 2d 1002, 171 N. Y. Supp. 2d 390 (1958), affirmed 8 App. Div. 2d 709, 185 N. Y. Supp. 2d 751 (1959), and Moriarty v. New York City Transit Authority, 11 App. Div. 2d 654, 201 N. Y. Supp. 2d 600 (1960).

The language in Langer, where liability was denied, is enlightening:

"While, as plaintiff contends, episodes had occurred in the station, recently prior to the instant happening, which showed the underpass as the scene of somewhat similar assaults, nevertheless, we must be mindful that criminal acts have recurred in other places of public assembly without legal consequence for a failure to post continual guards at the precise or nearby points of involvement. Where, however, recurrent attacks strongly suggest the imminence of others, then specific care and attention should be directed to the particular area in a reasonable and sensible effort to avoid future, indicated danger. A moral sense of obligation would compel such action more than anything else.

"Here, with the fullness of the knowledge asserted by the plaintiff, it is still more difficult, from the nature of things, though aided by the background of other incidents, to reasonably foresee and expect the instant incident, say, than the accident at the crowded platform during a 'rush' hour evolving from a surge of humanity or the fall occasioned by a defective hole, timely existent, in a subway stairway. These are elements which can be reckoned with in a reasonable, regular way; *but not so with crime,* and to guard against it with attempted timely prediction would often impose an unnecessary, unreasonable and even excessive duty." (Italics supplied.)

Furthermore, it must be noted that in some of the New York cases there appears to be some authorization or requirement that a separate police force be supplied by the "authority" itself. See Moriarty, supra, and Bass v. City of New York and the New York City Housing Authority, 38 App. Div. 2d 407, 330 N. Y. Supp. 2d 569 (1972).

As regards SEPTA, the "authority" in this case, however, there is no known statute, ordinance or other authoritative pronouncement which requires the transit authority in this case to maintain its own police force. If such there is, our order for retrial will afford an opportunity for developing such circumstances for the record. Nor is Amoruso v. N. Y. City Transit Authority, 12 App. Div. 2d 11, 207 N. Y. Supp. 2d 855 (1960), inapposite. That case simply stands for the proposition that a motion to dismiss is an inappropriate manner in which to deal with these cases.

Aside from the policing question, however, we have concluded that the primary issues of law which are now raised cannot be determined upon the findings made by the trial judge. For example, we cannot determine from the language in the first finding what was the basis on which SEPTA "was the one negligent which caused minor Plaintiff's injuries." Was it ordinary common carrier negligence of some kind, the failure to provide its own police force, the failure to call on the Philadelphia police for policing of its station platform, or was it an absolute liability to pay for damages regardless of normal fault consideration? Liability without fault, either on the contract theory of a warranty of safe conduct or on the theory that a common carrier has the responsibility of an insurer, has never been adopted in this Commonwealth, but liability may be imposed only for injuries resulting

from negligence. See Sykes v. Southeastern Pennsylvania Transportation Authority, 225 Pa. Superior Ct. 69, 310 A. 2d 277 (1973).

It is urged that the trial judge could and did, as he stated, take judicial notice of facts which would support his findings and award. The record contains the following:

"THE COURT: Well, of course, I won't accept that. As a matter of fact, we can take judicial notice of what is happening in our subways."

We need not decide whether negligence may be established by judicial notice on the part of the trier of the facts, although this seems like asking a jury to use the personal knowledge of its members to supplement testimony from the witness stand. We need not decide this question, because here again we have no way of learning whether and what judicial notice was exercised.

To summarize: it is evident that the parties see this case as one of major significance in the area of negligence law as to the duties and responsibilities of mass transportation authorities with regard to passenger injuries caused by misconduct of other passengers, including criminal assaults. They see this case as one of first instance in Pennsylvania. For example, SEPTA views affirmation of liability in this case as a directive which would require a transportation authority to police, not only every subway platform, but every corner and every one of thousands of bus and trolley load and unload stops. Obviously, the transportation authority in this case, which provides common carrier transportation in five major counties, could hardly be expected to meet any such sweeping policing responsibilities. Each of the counties has a separate police force, autonomous from the others. Ordinarily, also, load and unload locations are in the public domain and, therefore, are the responsibility of the local

police. We see the scope of this case, however, as one in which the area of concern is narrowed to only those locations where large numbers of passengers regularly and predictably are prone to engage in unruly and criminal conduct that is physically hazardous to other passengers. It is as to these locations, we think, that the question may reasonably be raised whether a common carrier authority must supplant or augment the regular local police. If so, does such an authority share the immunity of such public police or can the authority's defaults and delinquencies subject it, although at least a quasi-public entity, to liability for such injuries suffered by its passengers? In short, is there a difference in this respect between the duties of a privately owned common carrier and one operated by a publicly authorized and funded authority? Areas of immunity have been recently narrowed by our Supreme Court ruling,* and immunity·has never been applied to relieve a carrier authority such as SEPTA from the responsibility that privately financed carriers have always had for ordinary negligent, noncriminal, injuries to passengers. Would police immunity apply to an authority with police duty? This question was raised in Bass, supra, involving a housing authority which had its own police force, where suit was brought for rape and murder in a housing project on the ground that the authority had furnished inadequate police protection, since there had been a number of criminal incidents at the project prior to the rape and murder. It was held in Bass that the authority's private police force should be accorded the immunity of the regular city police and liability was denied. The majority opinion states, 330 N. Y. Supp. 2d 576:

"It. is well settled that a municipality, acting in its

---

* Biello v. Pa. Liquor Control Bd., 454 Pa. 179, 301 A. 2d 849 (1973).

governmental capacity for the protection of the general public, cannot be cast in damages for a mere failure to furnish adequate police protection to a particular individual to whom no special duty is owed."

Justice Gulotta, dissenting, points out a special question that can arise when a special or private police force is required. He states, at page 580:

"I agree with the finding by the trial court that the proof of negligence was overwhelming. The security measures adopted were meaningless in view of the known dangers with which they were intended to cope. When coupled with the known fact that the very existence of the appellant's private police force would greatly curtail, if not entirely eliminate, patrolling by the New York City public police force, the appellant's measures were completely inadequate to meet a standard of ordinary prudence."

It is obvious from the above that divided police responsibilities can result in new questions as to passenger safety and adequacy of protective forces or measures.

## ORDER

And now, March 19, 1974, the findings entered by the trial judge on June 26, 1972, are vacated and set aside, and a new trial is ordered.